# In the United States Court of Federal Claims

No. 20-865

(Filed:  5 January 2024[*])

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| HAVIV YIFRACH, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Saul Bienenfeld*, Bienenfeld Law, of Cedarhurst, NY, for plaintiff.

*Steven Michael Mager*, Senior Trial Counsel, with whom were *Deborah A. Bynum*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *Brian M. Boyton*, Principal Deputy Assistant Attorney General, Civil Division, Department of Justice, all of Washington, DC, for defendant.

## OPINION AND ORDER

**HOLTE**, **Judge**.

This matter concerns an alleged agreement between plaintiff and the Federal Bureau of Investigation (FBI).  Plaintiff alleges the government promised to provide him compensation and protection in exchange for his services as an undercover informant during the FBI's investigation of an Israeli criminal gambling organization in the United States southwest.  Plaintiff filed a Complaint in 2018, which the Court dismissed in 2019 for failure to state a claim.  The Federal Circuit affirmed the dismissal in 2020.  Plaintiff subsequently filed the instant case later in 2020.  Plaintiff's new Amended Complaint closely tracks his previously dismissed complaint but now alleges additional details in an attempt to overcome prior insufficiencies.  Plaintiff claims with greater specificity how the government breached its alleged contract, as well as the implied duty of good faith and fair dealing, by failing to provide various benefits FBI officials had promised him.

---

[*] This Opinion and Order was originally filed under seal on 23 December 2023 pursuant to the protective order in this case.  The Court provided the parties an opportunity to review this Opinion for any proprietary, confidential, or other protected information and submit proposed redactions by 4 January 2024 at 12:00 p.m. (ET).  The parties did not propose any redactions.  The Court accordingly reissues the Opinion and Order unredacted.

The circumstances for any informant involved in illegal activity are not easy; payment is even more difficult—the government acknowledged at oral argument the informant pay system is effectively like "Wheel of Fortune": the procedure is discretionary and post-hoc, despite any promises agents make to informants.[1]  FBI guidelines further imply agents may instruct informants to contract on behalf of the United States, but the government nevertheless argues agents may not guarantee regular payment contracts with informants themselves.

In this case, the government denies the existence of any agreement and maintains even if there was a written agreement, the government representatives who allegedly signed the contract did not have actual authority to contract on behalf of the government rendering the agreement unenforceable.  In 2021, the government moved to dismiss plaintiff's Complaint for lack of jurisdiction and failure to state a claim.  After December 2021 oral argument, the Court granted a stay of consideration on the government's Motion pending agreement regarding limited discovery on contractual authority.  Following limited discovery, in 2022, the government renewed its Motion to Dismiss and submitted, in the alternative, a motion for summary judgment.[2]  For the following reasons, the Court denies the government's Motion to Dismiss but grants the government's Motion for Summary Judgment and again dismisses plaintiff's case.

## I.    Background

The Court previously addressed similar allegations in plaintiff's related case, filed on 31 August 2018.  *See* Complaint, *Yifrach v. United States* (*Yifrach I*), 145 Fed. Cl. 691 (2019), *aff'd*, 825 F. App'x 899 (Fed. Cir. 2020) (mem.), ECF No. 1.  On 13 November 2019, the Court held "plaintiff's complaint fail[ed] to plausibly allege any of the government officials with whom plaintiff worked or who participated in the FBI meeting had express or implied authority to bind the United States to contract."  *Yifrach I*, 145 Fed. Cl. at 707.  The Court reasoned "[p]laintiff's complaint . . . fails to state a claim for breach of contract[, and the government's] motion to dismiss for failure to state a claim is granted."  *Id.* (emphasis omitted) (footnote omitted).  The Court did not reach the government's motion for summary judgment in the alternative and dismissed the case without prejudice.  *Id.*

### A.    Factual History

The Court draws the following facts from plaintiff's Amended Complaint, which largely mirrors the Complaint filed in his previous case.  *Compare* Am. Complaint, ECF No. 40, *with* Complaint, *Yifrach I*, 145 Fed. Cl. 691.  For defendant's Motion to Dismiss pursuant to RCFC

---

[1] 21 June 2023 Oral Argument Transcript at 47:12–19 ("THE COURT:  So it's like Wheel of Fortune?  [THE GOVERNMENT]:  Well, I mean one assumes the government's going to act in good faith . . . but yes, I mean that's effectively [correct] . . . ."), ECF No. 84; *see infra* Section VI.B.

[2] The government raises three issues:  (1) "[w]hether the six-year statute of limitations, 28 U.S.C. § 2501, bars this action"; (2) "[i]n the alternative, whether the complaint fails to state a claim upon which relief can be granted because the plaintiff fails to plausibly allege that he entered into an agreement with an individual with the authority to contract with a confidential human source (CHS), or that the alleged agreement was approved by an individual with contracting authority"; (3) "[i]n the alternative, whether the United States is entitled to summary judgment because Mr. Yifrach cannot demonstrate that he entered into a contract with the United States with an individual with the authority to contract with a CHS, or that the alleged agreement was approved by an individual with contracting authority."  Def.'s Mot. to Dismiss or Mot. for Summ. J. ("Def.'s MTD/MSJ") at 1–2, ECF No. 71.

12(b)(1), the Court takes all "allegations . . . as true and construe[s them] in a light most favorable to the complainant." *Cedars-Sinai Med. Center v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993). Likewise, in considering defendant's Motion to Dismiss pursuant to RCFC 12(b)(6), the Court "assume[s] all factual allegations to be true and . . . draw[s] all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). For defendant's Motion for Summary Judgment, the Court further addresses any facts from the parties' briefing post-limited discovery and treats inferences gleaned from "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the light most favorable to the party opposing the motion. RCFC 56(c)(1)(A); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 575, 587 (1986) (examining the non-movant's evidence in the light most favorable to the non-movant and drawing all justifiable inferences in favor of the non-movant during summary judgment proceedings).

The Court previously outlined the facts of this case in *Yifrach I*. Plaintiff's current Complaint differs slightly from his previous allegations. The facts from *Yifrach I* are reproduced below, followed by a list of plaintiff's additional or amended facts in this case:

> Plaintiff Haviv Yifrach, an Israeli citizen, responded to an Israeli newspaper advertisement for employment with an Israeli organization in the United States. Compl. ¶ 4. Following an interview, the organization offered plaintiff a position working on slot machines in the United States, assuring him the work was legal. *Id.* ¶ 5. In January 2012, plaintiff flew from Israel to Los Angeles, where the director of the organization's Phoenix business operations met him. *Id.* ¶ 6. A few days later, plaintiff traveled to Phoenix, Arizona, where he began supplying slot machines to gas stations and stores, as well as collecting revenues from those machines and transferring them to higher echelons of the organization. *Id.* ¶ 7. Plaintiff soon realized, despite what the organization initially told him, the organization's work was illegal, and he reported this information to the FBI. *Id.* ¶¶ 8–9. Shortly thereafter, two law enforcement agents named Mike and Christian, along with an Arizona State Police official, informed plaintiff they intended to work with him as an undercover informant. *Id.* ¶¶ 12–16.

> Beginning in February 2012, plaintiff provided information about the criminal organization to the FBI agents and other law enforcement officials. Compl. ¶¶ 17–18. Plaintiff alleges when the FBI realized how valuable plaintiff was and how much the undercover work endangered him, the FBI agreed to make him a "special contract employee and agent," being referred to as an "undercover 'special agent.'" *Id.* ¶ 19. The FBI allegedly made numerous promises to plaintiff in exchange for his undercover services. *See id.* ¶¶ 19–20. Plaintiff alleges the FBI promised, among other things: $7,500 "tax free" every two weeks; two apartments, two rental cars, a kosher food allowance, and U.S. citizenship for plaintiff and his wife; reasonable protection and security for him and his family; and, at the conclusion of the investigation, a $2.5 million lump sum payment "tax free," a mansion, and two cars, all from assets seized during the investigation. *Id.* ¶¶ 19–20, 25. The FBI agents allegedly promised to "mak[e] good-faith 'best efforts' to apply for,

recommend and/or support an award under the Dept. of Justice's Forfeiture Guidelines of an award to Plaintiff of 20% of the value of the forfeited assets of the Organization that were collected by the U.S. Dept. of Justice's Forfeiture Program." *Id.* ¶ 58.

In March 2012, the FBI agents whom plaintiff worked with notified him the "terms of his contract with the FBI had been approved by higher-ups within the FBI and the Department of Justice," and "the FBI would like him to participate in a meeting at the FBI field office in Phoenix to finalize a formal agreement with him." *Id.* ¶ 22.  The next day, plaintiff alleges he met with "several agents and governmental representatives, Mike [an FBI field agent], Christian [a special agent of the California Department of Justice], a representative of the U.S. Dept. of Justice, 'Rebecca' (another federal agent), and Mark Brnovich, who was identified as the Director of the Arizona Department of Gaming" at the Phoenix FBI office.  Compl. ¶ 23.  A Hebrew-English translator was also allegedly present at the meeting to ensure plaintiff, a native Hebrew speaker, understood the terms of the agreement. *Id.*  Plaintiff and "all of the various U.S Dept. of Justice and other law enforcement agents who were present at the meeting" signed the agreement.  *Id.* ¶ 26.  After signing, plaintiff asked for a copy of the agreement, "but was told that, 'for his own good,' and in the interests of the security of Plaintiff and his family, the original and any copies of the agreement should stay with the FBI and Dept. of Justice." *Id.* ¶ 27.

Shortly after signing the agreement, plaintiff flew back to Israel to bring his wife to the United States.  *Id.* ¶ 28.  On 27 March 2012, plaintiff and his wife flew to the United States.  *Id.* ¶ 29.  Around that time, they settled into an apartment in Tempe, Arizona.  *See id.* ¶ 34.  Plaintiff thereafter regularly met with FBI agents, one of whom gave plaintiff $7,500 cash every two weeks, "in accordance with Plaintiff's employment agreement."  Compl. ¶ 35.

By the end of August 2012, the criminal organization suspected plaintiff was providing information to the FBI.  *Id.* ¶ 41.  Plaintiff informed FBI agents of these suspicions, but they reassured plaintiff "he had nothing to worry about."  *Id.* ¶ 43. Soon afterward, however, the criminal organization directed plaintiff to fly to New York to "shift gears."  *Id.* ¶ 45.  While there, plaintiff met with senior members of the criminal organization.  *See id.* ¶ 48.  They reported they knew plaintiff was working with law enforcement as an informant, severely beat him, and took everything in his possession—including his clothing—leaving only his watch and Israeli passport.  *See id.* ¶¶ 50–53.

Following this incident, in September 2012, plaintiff and his wife returned to Israel for their safety.  Compl. ¶ 55.  Plaintiff continued to provide information to the FBI, but the FBI discontinued payments to him.  *Id.* ¶¶ 56–57.

*Yifrach I*, 145 Fed. Cl. at 695–96.

Plaintiff's Amended Complaint in this case contains additional or supplemented facts from the complaint in his previous case, including:

- The FBI agents promised to make "good faith 'best efforts' to apply for, recommend and/or support an award . . . under the applicable Federal Statutes and Guidelines." Am. Compl. ¶ 44.
- Plaintiff requested to fly back to Israel to discuss the matter with his wife and attorney. *Id.* ¶ 28.  Later in March 2012, plaintiff allegedly called the FBI from Israel and accepted the government's offer.  *Id.* ¶ 31.  On 27 March 2012, plaintiff, his wife, and his attorney flew to the United States.  *Id.* ¶ 34.  Plaintiff was held at the airport for questioning, and plaintiff's attorney was denied entry into the United States and therefore returned to Israel.  *Id.*  At Newark Airport, plaintiff was taken into a private room for questioning and was released after his status with the FBI was confirmed.  *Id.* ¶ 35.
- The United States Attorney General approved the terms of plaintiff's contract.  *Id.* ¶ 37.
- Plaintiff lists specific names for "several agents and governmental representatives" plaintiff met in late March 2012, including:  an FBI field agent, a California Department of Justice special agent, a federal agent, an Assistant U.S. Attorney, and the director of the Arizona Department of Gaming, Phoenix FBI Office.  *Id.* ¶ 41.  He also alleges the presence of an unknown FBI supervisor.

## II.   Procedural History

On 13 November 2019, in plaintiff's related case, *Yifrach v. United States* (*Yifrach I*), 145 Fed. Cl. 691 (2019), *aff'd*, 825 F. App'x 899 (Fed. Cir. 2020) (mem.), the Court issued an order granting the government's Motion to Dismiss plaintiff's 31 August 2018 Complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").[3]  On 13 July 2020, plaintiff filed a complaint in this case.  Compl., ECF No. 1.  The same day, plaintiff filed a motion for leave to proceed *in forma pauperis*, ECF No. 2; a motion for a fee exemption and/or for extension to pay court fees, ECF No. 3; a motion for a protective order, ECF No. 4; a declaration, ECF No. 5; a notice of directly related cases, ECF No. 6; a motion for filing motions through e-mail, ECF No. 7; and a motion to seal the case, ECF No. 8.  On 20 July 2020, plaintiff filed an e-notification consent form, ECF No. 13.  On 30 July 2020, the government filed its Response to plaintiff's Motion for a Protective Order, ECF No. 15.  On 11 September 2020, the Court granted plaintiff's

---

[3] In its 13 November 2019 Order, the Court raised the issue of standing *sua sponte*, considering "[s]tanding is a threshold jurisdictional issue." *Yifrach v. United States* (*Yifrach I*), 145 Fed. Cl. 691, 696 (2019), *aff'd* 825 Fed. Appx. 899, 900 (Fed. Cir. 2020) (fist citing *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002); and then citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04 (1998)).  The Court analyzed another Court of Federal Claims case addressing Israeli citizens' standing to sue the United States in this court to draw parallels, *Gal-Or v. United States*, 113 Fed. Cl. 540, 551 (2013).  In *Gal-Or*, plaintiffs "provided the court with a list of agreements, treaties, [and] memoranda of understanding between the United States and Israel . . . to demonstrate reciprocity."  *Id.* at 550.  Based on the Treaty of Friendship, Commerce, and Navigation between the United States and Israel, as well as the Court's independent analysis, the Court in *Gal-Or* found "to the extent that all plaintiffs are citizens of Israel, the requirements of the Reciprocity Act have been met."  *Id.* at 551.  The Court, citing *Gal Or*, determined "although plaintiff [in this case] did not plead allegations to demonstrate his standing under the Reciprocity Act, for the purposes of resolving this [case], the Court assumes plaintiff has standing to bring this suit."  *Yifrach I* at 697 (2019), *aff'd* 825 Fed. Appx. 899, 900 (Fed. Cir. 2020).

Application to Proceed *In Forma Pauperis* and consequently denied as moot plaintiff's Motion for Fee Exemption. 11 Sept. 2022 Order, ECF No. 17. The Court also denied as plaintiff's Motion Requesting Electronic Filing Permissions, considering his e-notification consent form satisfies the relief requested. *Id.* Additionally, the Court granted plaintiff's Motion to Seal the case in the 11 September 2020 Order. *Id.* Finally, the Court stayed plaintiff's Motion for Protective Order until the government answered or otherwise responded to plaintiff's Complaint. *Id.* On 6 October 2020, the government filed a motion for a protective order, ECF No. 19. On 20 October 2020, plaintiff filed its Response to the government's Motion, ECF No. 23, and the government replied in support of its Motion, ECF No. 24. On 21 October 2020, the Court granted the government's Motion for a Protective Order, ECF No. 25.

On 12 January 2021, plaintiff filed an Amended Complaint. Am. Compl., ECF No. 40. On 5 April 2021, the government filed a motion to dismiss. Def.'s Mot. To Dismiss, ECF No. 45. Plaintiff responded on 1 June 2021, ECF No. 48, and the government replied on 29 July 2021, ECF No. 51. On 14 December 2021, the Court held oral argument on the government's Motion to Dismiss at the United States Court of International Trade in New York City, New York, *see* ECF No. 57. On 15 December 2021, the Court granted the parties' joint motion to Stay Consideration of the Motion to Dismiss for 30 days, ECF No. 58, pending discussion between the parties regarding the resolution of certain discovery requests and other matters raised at argument, ECF No. 59. On 18 May 2022, the parties filed a joint motion for a status conference, ECF No. 63, "to discuss the status of the pending motion to dismiss, in light of the documents produced by the United States, and to assist in the resolution of issues that have emerged in connection with this production." *Id.* at 1. The Court granted the parties' Motion and held a telephonic status conference on 16 June 2022, ECF No. 64. On 17 June 2022, the parties filed a joint status report and motion for a scheduling order, ECF No. 65, proposing further steps for limited discovery. The Court issued a limited discovery scheduling order on 21 June 2022, ECF No. 66. On 2 September 2022, the government filed a renewed motion to dismiss, or in the alternative, motion for summary judgment. Def.'s Mot. To Dismiss or Mot. For Summ. J. ("Def.'s MTD/MSJ"), ECF No. 71. On 29 October 2022, plaintiff responded to the government's Motion. Pl.'s Resp., ECF No. 73. On 19 December 2022, the government replied in support of its Motion. Def.'s Reply, ECF No. 76. On 21 June 2023, the Court held another oral argument in Washington, DC, ECF No. 82; *see* Oral Argument Transcript ("Tr."), ECF No. 84.

## III.    Parties' Arguments

Plaintiff alleges he entered into a contract with the government for compensation for his work as an undercover informant. *See* Am. Compl. ¶ 100–13. The government's moves to dismiss plaintiff's Amended Complaint pursuant to RCFC 12(b)(1) as being barred by the statute of limitations or, alternatively, pursuant to RCFC 12(b)(6) for failure to allege an agreement with any individual having express or actual implied contracting authority. Def.'s MTD/MSJ at 1. The government's motion for summary judgment argues there is no dispute of material fact supporting the existence of contracting authority. *Id.*

## IV.    Applicable Legal Standards

A.      **Motion to Dismiss for Lack of Subject Matter Jurisdiction Under RCFC 12(b)(1)**

"Subject matter jurisdiction is a threshold issue that must be determined at the outset of a case." *King v. United States*, 81 Fed. Cl. 766, 768 (2008) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)). When deciding a motion to dismiss for lack of subject matter jurisdiction, the court must assume the allegations in the complaint are true and "draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). Nevertheless, plaintiff still bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) (citing *Zunamon v. Brown*, 418 F.2d 883, 886 (8th Cir. 1969)). If a motion to dismiss under RCFC 12(b)(1) challenges jurisdictional facts alleged in the complaint, "the court may consider relevant evidence to resolve the factual dispute." *Id.* at 747.

"[T]he United States, as sovereign, 'is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *United States v. Testan*, 424 U.S. 392, 399 (1976) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). This Court's authority to grant relief in a contract dispute like the present case is limited by the extent to which the United States has waived sovereign immunity through the Tucker Act. *See* Tucker Act, 28 U.S.C. § 1491; *Testan*, 424 U.S. at 399. Even if a plaintiff presents an otherwise cognizable claim, the Tucker Act bars any claims not "filed within six years after such claim first accrues." 28 U.S.C. § 2501. This statute of limitations expressly limits "the Tucker Act's waiver of sovereign immunity." *Hart v. United States*, 910 F.2d 815, 817 (Fed. Cir. 1990) (citing *Soriano v. United States*, 352 U.S. 270, 273–74 (1957)). The statute of limitations is an absolute, "jurisdictional" bar to claims filed outside of this six-year period. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008).

B.      **Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted Under RCFC 12(b)(6)**

Even if a court has subject matter jurisdiction, a complaint may be dismissed for failure to state a claim if plaintiff fails to allege facts sufficient to establish a valid contract with the United States. *See Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1324–25 (Fed. Cir. 1997).

The Court previously identified the standard for a motion to dismiss pursuant to RCFC 12(b)(6) in *Yifrach I*:

In deciding a RCFC 12(b)(6) motion to dismiss, the Court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). To survive a RCFC 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. This principle is "inapplicable to legal conclusions," however, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557); *see also Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

In a prior confidential informant case, another judge on this [c]ourt clarified the pleading standard for breach of express or implied-in-fact government contracts. *See Marchena v. United States*, 128 Fed. Cl. 326, 333–34 (2016), *aff'd*, 702 F. App'x 988 (Fed. Cir. 2017) (mem.). A confidential informant plaintiff "must sufficiently plead the elements of a contract with the United States," including "actual authority on the part of the government's representative to bind the government." *Id.* at 333 (internal quotation omitted) (quoting *Biltmore Forest Broad. FM, Inc. v. United States*, 555 F.3d 1375, 1380 (Fed. Cir. 2009)). Consistent with the *Twombly* and *Iqbal* pleading standard, plaintiffs must plead enough facts to make it plausible a government representative with contracting authority entered the alleged contract. For example, in *Marchena*, this Court found the complaint "[did] not meet the plausibility standard articulated in *Iqbal*" because the plaintiff failed to allege the name and official roles of the "superiors and other [g]overnment [a]gents" who allegedly had authority. *Id.* at 333–34. In another prior informant case, this Court emphasized that the *Twombly* standard replaced the "[pre-2007] *Conley* standard," as set forth and applied in *Sommers Oil Co. v. United States*, 241 F.3d 1375 (Fed. Cir. 2001). *Sahagun-Pelayo v. United States*, No. 13–929, 2014 WL 3643471, at *3 (Fed. Cl. July 22, 2014) (citing *May v. United States*, 80 Fed. Cl. 442, 446 (2008)). Additionally, in the complaint plaintiffs must identify the source of the government official's alleged authority . . . . *See Marchena*, 128 Fed. Cl. at 334.

*Yifrach v. United States* (*Yifrach I*), 145 Fed. Cl. 691, 697–98 (2019), *aff'd*, 825 F. App'x 899 (Fed. Cir. 2020) (mem.).

### C.    Motion for Summary Judgment under RCFC 56

Summary judgment is appropriate where the evidence demonstrates there is "no genuine issue as to any material fact and that the movant is entitled to judgement as a matter of law." RCFC 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine issue is one that "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. A fact is material if it might affect the outcome of the suit. *Id.* at 248. In determining if summary judgment is appropriate, a court will draw all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. A party seeking summary judgment bears the burden of establishing the "absence of any genuine issues of material fact."

8

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting *Catrett v. Johns-Manville Sales Corp.*, 756 F.2d 181, 184 (D.C. Cir. 1985), *rev'd sub nom. Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

When the moving party has met this burden, the burden shifts and the nonmovant must point to sufficient evidence to show a dispute exists over a material fact allowing a reasonable fact finder to rule in its favor. *Anderson*, 477 U.S. at 255–57. The evidence need not be admissible, but mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative will not defeat summary judgment. *Id.* at 248–49; *Celotex*, 477 U.S at 324; *see also Brooks v. County Comm'n*, 446 F.3d 1160, 1162 (11th Cir. 2006) ("[A] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party.").

## V.    The Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources (13 December 2006)

Both parties rely heavily on FBI guidelines for interactions with confidential human informants (published as *The Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources*) for support in their briefs. *See* DEP'T OF JUST., THE ATTORNEY GENERAL'S GUIDELINES REGARDING THE USE OF FBI CONFIDENTIAL HUMAN SOURCES (2006), App. to Def.'s MTD/MSJ ("Def.'s App.") Ex. 3 at 128–81, ECF No. 71-3 [hereinafter GUIDELINES]. The guidelines are not a model of clarity; the Court therefore begins analysis on the case issues with an outline of the relevant sections of the *Guidelines* underlying the dispute.

### A.    Purpose and Scope

The *Guidelines* generally govern the procedures federal agents must follow during the acquisition of information from confidential informants. The Court asked the government at oral argument, "Is this the FBI agent's acquisition regulations for the purposes of procuring information from human sources?" Tr. at 40:6–7 (the Court). The government responded, "I believe so." Tr. at 40:8. The government confirmed these were binding in a similar way the Federal Acquisition Regulations are binding in government procurement cases. Tr. at 40:3–11. While the FBI caveats the *Guidelines* do not represent the "entire universe of what the FBI must do" when handling a Confidential Human Source (CHS), *see* Tr. at 39:12–18 ("There are going to be other documents internally . . . ."), the FBI agreed with plaintiff the 59-page document "is not advisory in nature. It's one that the FBI must follow." Tr. at 39:19–24; *see* Tr. at 39:23–40:1 ("[GOVERNMENT]: . . . [The *Guidelines*] state[], under 'Purposes and Scope,' that these guidelines are mandatory and supersede the Attorney General "Guidelines" for confidential informants dated 30 May 2002."); *Guidelines* § I.A ("Purpose and Scope"), Def.'s App. at 134–36. The government notes "an FBI agent . . . could be subject to internal discipline or other sanctions for not following these mandatory *Guidelines*." Tr. at 41:2–5 (counsel for FBI); see Tr. a 40:9–11 ("THE COURT:  So, if . . . FBI agent[s] do[] not follow these [*Guidelines*], they will suffer disciplinary action?  [THE GOVERNMENT]:  They could have.").

### B.    Opening an FBI Informant

Section II.B of the *Guidelines* provides a list of information that must be relayed to a CHS at the onset of his or her service to the FBI. The *Guidelines* emphasize the need for the FBI to clearly convey the outlined instructions to the informant. *See Guidelines* § II.B.3, Def.'s App. at 149 ("The content and meaning of each of the foregoing instructions must be clearly conveyed to the Confidential Human Source."). The *Guidelines* identify procedures for confirming both acknowledgment of receipt and understanding of any instructions:

> Immediately after these instructions have been given, the FBI Agent shall require the Confidential Human Source to acknowledge his or her receipt and understanding of the instructions. The FBI Agent, and the additional Agent or other government official present as a witness, shall document that the instructions were reviewed with the Confidential Human Source and that the Source acknowledged the instructions and his or her understanding of them. As soon as practicable thereafter, an FBI Supervisor shall review and, if warranted, approve the documentation.

*Id.* The *Guidelines* recognize a need to potentially repeat the instructions for continued confirmation of awareness. *See Guidelines* § II.B.4, Def.'s App. at 149 ("The instruction and documentation procedures shall be repeated to the Confidential Human Source whenever it appears necessary or prudent to do so, and, in any event, at least annually.").

The government explains the first half of Section II.B is internally referred to as a "Memorandum of Admonishments" and is a list of preliminary warnings an agent must read and explain to an informant at the outset of a relationship. *See* 14 Dec. 2021 Oral Arg. Tr. at 14:19–20; Tr. at 51:10–16. The first list included in Section II.B states:

> 1. In opening a Confidential Human Source, at least one FBI Agent, along with one additional Agent or other government official present as a witness, shall review with the Confidential Human Source instructions as required by these Guidelines and other FBI policies. At a minimum, these instructions must indicate that:
>
>     a. information provided by the Confidential Human Source to the FBI must be truthful;
>     b. the Confidential Human Source's assistance and the information provided are entirely voluntary;
>     c. the United States Government will strive to protect the Confidential Human Source's identity but cannot guarantee that it will not be divulged; and
>     d. the Confidential Human Source must abide by the instructions of the FBI and must not take or seek to take any independent action on behalf of the United States Government.

*Guidelines* § II.B.1, Def.'s App. at 147.

The government refers to the second half of Section II.B as "a very straightforward reading." Tr. at 49:2. The instructions are less than clear, however, especially considering the "if applicable" provision and other optional instructions emphasized *infra*:

> 2. The following additional instructions shall also be reviewed with a Confidential Human Source *if applicable to the particular circumstances* of the Confidential Human Source:
>
> > a. The FBI on its own cannot promise or agree to any immunity from prosecution or other consideration by a [Federal Prosecuting Office (FPO)], a state or local prosecutor, or a Court in exchange for the Confidential Human Source's cooperation, because the decision to confer any such benefit lies within the exclusive discretion of the FPO and the Court. However, the FBI will consider (*but not necessarily act upon*) a request by the Confidential Human Source to advise the appropriate FPO, the state or local prosecutor, or Court of the nature and extent of his or her assistance to the FBI;
> >
> > b. The Confidential Human Source is not an employee of the United States Government and may not represent himself or herself as such;
> >
> > c. The Confidential Human Source may not enter into any contract or incur any obligation on behalf of the United States Government, *except as specifically instructed and approved* by the FBI;
> >
> > d. The FBI *cannot guarantee any rewards*, payments, or other compensation to the Confidential Human Source;
> >
> > e. *In the event that the Confidential Human Source receives any rewards*, payments, or other compensation from the FBI, the Source is liable for any taxes that may be owed; and
> >
> > f. No promises or commitments can be made, except by the United States Department of Homeland Security, regarding the alien status of any person or the right of any person to enter or remain in the United States.
>
> 3. The content and meaning of each of the foregoing instructions must be clearly conveyed to the Confidential Human Source. Immediately after these instructions have been given, the FBI Agent shall require the Confidential Human Source to acknowledge his or her receipt and understanding of the instructions. The FBI Agent, and the additional Agent or other government official present as a witness, shall document that the instructions were reviewed with the Confidential Human Source and that the Source acknowledged the instructions and his or her understanding of them. As soon as practicable thereafter, an FBI Supervisor shall review and, if warranted, approve the documentation.
>
> 4. The instruction and documentation procedures *shall be repeated to the Confidential Human Source whenever it appears necessary* or prudent to do so, and, in any event, at least annually.

*Guidelines* § II.B.2–4, Def.'s App. at 147–49 (emphasis added).

In trying to delineate the FBI's ability to contract with an informant, the Court asked the government at argument, "[I]s the difference here that the FBI cannot guarantee anything, . . . but other agencies can?"  Tr. at 48:17–19.  The government's response does not instill confidence as to the clarity of the *Guidelines*:  "Well, they might be able to, but I can't say.  You know, you know, no promises or commitments can be made except by the United States Department of Homeland Security.  So, the FBI does not have any ability to make any promises."  Tr. at 20–24.  According to the government, "the FBI can't make the promises or commitments," but other agencies "might be able to" make guarantees.  Tr. at 48:6–14, 20 ("[THE GOVERNMENT]:  . . . Whether or not DHS can make those promises or commitments is an issue for DHS, not for the FBI.  The FBI is simply disclaiming authority in that area, which is proper, because, I mean, . . . the Department of Homeland Security is now a separate department from the Department of Justice.  THE COURT:  So, they do guarantee things?  [THE GOVERNMENT]:  They may.  I don't know.");  Tr. at 49:11–15 ("[THE GOVERNMENT]:  DHS might be able to guarantee things.  Again[,] . . . the FBI doesn't have the ability to waive taxes.  That's, again, an IRS matter.  The government is divided into various lines of authority.").

The practical application of Section II.B.2.d is particularly unclear, however:  although the government says the FBI does not have the ability to make promises with informants, the *Guidelines* imply FBI agents can instruct informants to enter into contracts on behalf of the United States.  Section II.B.2 reads:  "The Confidential Human Source may not enter into any contract or incur any obligation on behalf of the United States Government, *except as specifically instructed and approved by the FBI*."  *Guidelines* § II.B.2.d, Def.'s App. at 148 (emphasis added).  The government "suppose[s] [CHS contracting is] possible . . . if specifically approved."  Tr. at 43:14–15; Tr. at 44:14–17 ("THE COURT:  Well, it seems like . . . the FBI may contract, instruct, or approve a CHS to contract on behalf of the United States Government.  [THE GOVERNMENT]:  I suppose it's possible.").  Such a CHS contract, furthermore, "doesn't go through those particular steps that they would have to do in that instance[;] . . . it would be certainly a rare circumstance in which . . . the FBI was telling [informants] to . . . enter into some [contract.]  [A]gain, this applies more in the business context."  Tr. at 43:15–21.  The government concludes by noting, "[y]ou often don't have instructions unless you have had a bad experience, so my guess is at some point the FBI had someone who claimed contracts they had entered into were entered into on behalf of the United States . . . ."  Tr. at 44:9–12.

The government claims contracting with informants is anathema to the type of relationship between agents and informants:

> [THE GOVERNMENT]:  . . . [G]enerally, the FBI is not entering into contracts or arrangements with informants.  As a general rule, not only do FBI agents not have the authority to enter into contracts, but there is an institutional reason not to do that, because, again, in law enforcement, . . . when you're dealing with an informant—particularly one who's involved in criminal activity—entering into a contract with them is anathema to the type of relationship that you need to have with that particular informant.

Tr. at 25:19–26:3.  In certain cases, the government caveats, "the government will enter into . . . a services agreement. . . .  [And this] involves substantial review up and down the chain."  Tr. at 26:4–8.  The government adds:  "Services agreements often make it easier for the agents, because in order to pay an informant, there is a very detailed process that you need to get approval up your chain before you pay an informant . . . ."  Tr. at 26:15–18.  In sum, "there are certain cases . . . where it might be in the FBI's interest to set up a services agreement, because they know they're going to be renting a place for six months or something along those lines, and they'll need it for operational reasons."  Tr. at 26:21–27:1.  The government maintains it is not aware of any agreements with informants for salary and has only seen agreements for expenses compensation, even recurring expenses like rent.  *See* Tr. at 58:17–59:24.  The government explained at argument how these services agreements might work:

> [THE GOVERNMENT]: . . . [S]ay you have the situation where someone is a confidential informant and they're a business owner.  They enter into contracts in their own private capacity, and then they say, "Well, those contracts are now the government's responsibility.  The government is responsible to pay those contracts," as though they're functioning through an agreement or as some sort of . . . subcontractor . . . .  I think this provision makes clear [informants] cannot do that.  They can't enter into things unless the FBI specifically said, "You can enter into a contract on our behalf."

Tr. at 42:12–23.  Thus, the *Guidelines* imply under certain occasions the FBI would specifically instruct and approve a CHS to engage on behalf of the United States; yet the government maintains it generally does not contract with informants.  *See Guidelines* § II.B.2.d, Def.'s App. at 148 (". . . except as specifically instructed and approved by the FBI").

### C.    Monetary Payments

For payments to an informant, the "FBI shall establish a written delegation of authority for approval . . . ."  *Guidelines* § IV.C.3, Def.'s App. at 161.  The government emphasizes the FBI cannot provide payment to an informant contingent upon a conviction.  Tr. at 68:14–16 ("THE COURT:  So, there is a prohibition on a payment for an outcome?  [THE GOVERNMENT]:  Yes, that is correct . . ." (citing *Guidelines* § IV.C.2, Def.'s App. at 161)).

### D.    Otherwise Illegal Activity

Section V of the *Guidelines* pertains to authorization of "Otherwise Illegal Activity" (OIA), which the government explained at oral argument is used when a CHS must participate in criminal activities as an informant:  "in order to engage in illegal activity, . . . the FBI, in coordination with the relevant federal prosecuting offices, will enter into what's an otherwise illegal activity sort-of agreement or stipulation, which allows [a CHS] to engage in such activity without having to fear . . . being prosecuted . . . ."  Tr. at 131:2–7.  The government expounds Mr. Yifach was privy to two OIA agreements:  (1) 9 April 2012 – 7 July 2012 and (2) 24 July 2012 – 21 October 2012.  *See* Tr. at 131:15–24 (citing Def. Appx. 116, 121, 126; Pl.'s Ex. L).  The second OIA authorization was revoked on 11 September 2012, and, according to the government, the FBI would have required plaintiff sign the revocation document had plaintiff not

left the country. *See* Tr. at 132:2–10 ("[THE GOVERNMENT]: Then[, FBI agents] have to get [Mr. Yifrach's] signature or are supposed to try to get his signature on the document, and Mr. Yifrach by that time had left the country."); Tr. at 132:21–23.

E.    **Closing an FBI Informant**

The government explains the process for closing a CHS, *Guidelines* § VII, is the same as opening in the *Guidelines*; yet the government claims plaintiff's situation here is covered by the exception included in paragraph 3 of the "Closing a Confidential Human Source" Section. *See infra* Section VIII.B.v; Tr. at 97:22–24 ("[THE GOVERNMENT]: I think the *Guidelines* weren't followed because it falls within the exception in paragraph 3 . . . ."). Section VII.A.3 provides an exception to notifying a CHS he or she has been closed when the CHS refuses to acknowledge such notice: "if the Confidential Human Source can be located, notify the Confidential Human Source that he or she has been closed as a Confidential Human Source and document that such notification has been provided . . .[;] *if the Confidential Human Source refuses to acknowledge his receipt and understanding of the notification, the FBI shall document the refusal*." *Guidelines* § VII.A.3, Def.'s App. at 180 (emphasis added). The government also explains while there is uncertainty regarding whether an Assistant U.S. Attorney (AUSA) has— or can be delegated—contracting authority, the AUSA definitely must be consulted when closing a CHS. *See* Tr. at 149:3–150:2.

VI.    **The Government's Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to RCFC 12(b)(1)**

Pending first before the Court is the government's Motion to Dismiss for Lack of Subject Matter Jurisdiction pursuant to RCFC 12(b)(1). The government contends plaintiff's alleged claim accrued "outside of this Court's six-year statute of limitations, [and] this Court [accordingly] does not possess jurisdiction to entertain his claims." Def.'s MTD/MSJ at 17. The government further asserts, "[P]ursuant to the statute of limitations, 28 U.S.C. § 2501, Mr. Yifrach was required to file his complaint in this Court by September 2018 (or, at the latest, October 2018) upon the FBI's failure to honor its purported contractual obligation and notification that he was being closed for cause." Def.'s MTD/MSJ at 20 (citation omitted). The government avers, "[C]ontrary to his claims, Mr. Yifrach did not work for the FBI after he was closed for cause." Def.'s MTD/MSJ at 21. The government alternatively argues, "Mr. Yifrach's allegations, however, even if true, do not alter the fact that the FBI would have been in breach of its alleged contract with Mr. Yifrach no later than October 2012 by failing to meet its obligations under the agreement." *Id.* The government concludes, "[b]ecause Mr. Yifrach's suit was filed outside of the six-year statute of limitations, we respectfully request that the Court dismiss Mr. Yifrach's complaint for lack of jurisdiction." *Id.* at 26.

Plaintiffs' argument for the Court's jurisdiction relies on two theories: (1) the applicability of equitable tolling due to his initially filed Complaint being an "amended complaint" to his first dismissed action; and (2) his continued contractual relationship with the FBI. For the first ground, plaintiff argues no case "address[ing] the filing of petitions within the 6 year statute of limitations as set forth under the Tucker Act . . . involve[s] the filing of an amended complaint after the original complaint was filed within the six-year statute of

limitations." Pl.'s Resp. at 16, ECF No. 73.  Plaintiff asserts, "[t]he controlling complaint is simply a continuation of the original action filed on August 31, 2018, within the six-year statute of limitations."  *Id*. at 18.  For his second grounds, plaintiff further alleges he "had continued contacts with members of the law enforcement task force he had been working with and had been introduced to thru the FBI."  Pl.'s Resp. at 19.  He contends, "the continuous contacts from various task force members thr[ough] 2018, including from [named FBI agents], gave Yifrach every plausible and reasonable belief that he was still working for the defendant."  *Id.* at 21. Plaintiff continues, "[i]t is plaintiff's position that . . . certain claims under the contract became ripe only after . . . [a] criminal case [supported by his CHI information] was concluded."  *Id.* at 22.  Plaintiff concludes, "[t]herefore, any claim . . . plaintiff's complaint was not timely filed must fail."  *Id.* at 22.

## A.      Equitable Tolling

The parties disagree on the applicability of equitable tolling, including the application of *John R. Sand & Gravel*.  *See* Pl.'s Resp. at 21–22; Def.'s Reply at 4.  In *John R. Sand & Gravel*, the Supreme Court affirmed the Federal Circuit's ruling the six-year statute of limitations in the Tucker Act was jurisdictional and therefore a predicate for court authority.  *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008), *aff'g*, 457 F.3d 1345 (Fed. Cir. 2006). Pursuant to the Tucker Act, a plaintiff must file his complaint within six years of his claim's accrual.  28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."); *see also San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1349–50 (Fed. Cir. 2011).  This statute of limitations serves as "an express limitation on the Tucker Act's waiver of sovereign immunity," *Hart v. United States*, 910 F.2d 815, 817 (Fed. Cir. 1990) (citing *Soriano v. United States*, 352 U.S. 270, 273–74 (1957)); thus it serves as an absolute "jurisdictional" bar to claims that are filed outside of this six-year period.  *John R. Sand & Gravel*, 552 U.S. at 134.  Should the Court determine that "it lacks jurisdiction over the subject matter, it must dismiss the claim."  *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006).

While a dismissal without prejudice does not bar the filing of a subsequent suit, the filing of a prior suit also does not toll the Tucker Act's six-year statute of limitations because the "six-year statute of limitations period is jurisdictional and may not be waived or tolled."  *See FloorPro, Inc. v. United States*, 680 F.3d 1377, 1380–2 (Fed. Cir. 2012) (citing *John R. Sand & Gravel Co.*, 552 U.S. at 136–39) ("Because section 2501's time limit is jurisdiction, the six-year limitations period cannot be extended even in cases where such an extension might be justified on equitable grounds.").  Indeed, when an action is dismissed without prejudice, the prior suit becomes a mere "nullity," to be treated as if it "never existed."  *Hayes v. United States*, 73 Fed. Cl. 724, 728 (2006) (citing *Holloway v. United States*, 60 Fed. Cl. 254, 261 (2004)). Accordingly, the existence of a prior complaint is irrelevant for such purposes, and plaintiff's August 2018 filing, dismissed in 2019, does not toll his claim.  *Id.*

Plaintiff cites *Irwin v. Department of Veterans Affairs* for the assertion equitable tolling "is available at least in some actions against federal entities."  Pl.'s Resp. at 18 (citing *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89 (1990)).  *Irwin*, however, merely established a general rule regarding the applicability of equitable tolling in suits against the government.  *Irwin*, 498 U.S.

15

at 95.  *John R. Sand & Gravel* later clarified equitable tolling is not available with respect to this court's statute of limitations.  *See* 522 U.S. at 137–38.  Plaintiff also relies on *United States v. Kwai Fun Wong*, 575 U.S. 402 (2015) in arguing equitable tolling is viable notwithstanding *John R. Sand & Gravel*.  Pl.'s Resp. at 18; Tr. at 111:25–112:3 ("THE COURT:  . . . [S]o, do you think that the Supreme Court in *Kwai Fun Wong* overruled *J.R. Sand & Gravel*?  [PLAINTIFF]:  Yes.").  Unlike the instant case, *Kwai Fun Wong* addressed the availability of equitable tolling in the context of the Federal Tort Claims Act, not the Tucker Act.  575 U.S. at 402.  Plaintiff cannot cite to any case distinguishing *John R. Sand & Gravel*.  Tr. at 113:14–114:2 ("THE COURT:  Can you cite to a Federal Circuit or Federal Claims precedent that clarifies *J.R. Sand & Gravel* is not still good law and that there now is equitable tolling available?  [PLAINTIFF]:  No, I cannot. . . ."  THE COURT:  So if I were to apply equitable tolling, then . . . the only case I could cite is *Kwai Fun Wong*? . . . [PLAINTIFF]:  I agree with that . . . .").

The Court, accordingly, is bound by equitable tolling being "foreclosed by *John R. Sand & Gravel*" and is unable to "waive[] or extend[] by equitable considerations" the statute of limitations.  *Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008) (quoting *John R. Sand & Gravel Co.*, 552 U.S. at 133).  Plaintiff's Amended Complaint is therefore not subject to equitable tolling.  *Id.*

### B.    Accrual

The parties dispute when plaintiff's claim began to accrue for purposes of the six-year statute of limitations.  28 U.S.C. § 2501 states, "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."  According to the government, "[t]he six-year limitation period commences on a plaintiff's claim when plaintiff is, or should be, aware of the pertinent events that fix any potential government liability."  Def.'s MTD/MSJ at 17 (first citing *San Carlos Apache Tribe*, 639 F.3d at 1350; and then citing *FloorPro*, 680 F.3d at 1381).

This court has held a claim regarding a contract with the government accrues when payment is wrongfully withheld.  *See Oceanic S.S. Co. v. United States*, 165 Ct. Cl. 217, 225 (1964) (per curiam) ("[W]here a claim is based upon a contractual obligation of the Government to pay money, the claim first accrues on the date when the payment becomes due and is wrongfully withheld in breach of the contract."); *accord Kinsey v. United States*, 852 F.2d 556, 557 (Fed. Cir. 1988).  A contract claim may nevertheless be suspended, however, under the "accrual suspension" rule.  Under the accrual suspension rule, the accrual date of a claim against the United States can sometimes be suspended when the plaintiff is unaware of the claim.  *See Ingrum v. United States*, 560 F.3d 1311 (2009); *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc).  At argument, the parties agreed the accrual date of a cause of action will be suspended only when the plaintiff can demonstrate the "defendant has concealed its acts with the result that plaintiff was unaware of their existence" or the injury was "inherently unknowable" at the time the cause of action accrued.  *Martinez*, 333 F.3d at 1319; Tr. at 121:12–22.  The government, however, asserts the Court should evaluate whether a contract claim has accrued (or has been suspended) based on the material terms of the contract as a whole, rather than on a term-by-term basis.  *See* Tr. at 121:23–122:14.

16

The government argues plaintiff should have known his claim accrued when he was advised his "case would be shut down" and he returned to Israel. *See* Def.'s Reply at 8. The government contends "any breach of the alleged agreement by the [g]overnment would have occurred . . . at the latest, October 2012," when plaintiff was closed as an informant. Def.'s Reply at 5; Def.'s MTD/MSJ at 3. Plaintiff, on the other hand, contends he was unaware he was closed as an informant for at least two years after 2012. Tr. at 120:9–21 Under the accrual suspension rule, plaintiff alleges his unawareness suspended his claim's accrual until at least October 2014. Tr. at 120:18–121:1.

The government argues plaintiff knew or should have known his claim accrued in 2012. The government cites *Young v. United States*, stating, "accrual of a claim against the United States is suspended 'until the claimant knew or should have known that the claim existed.'" Def.'s Reply at 7 (quoting *Young*, 529 F.3d 1380, 1384 (Fed. Cir. 2008)). In *Young*, the court declined to find the plaintiff's claim accrual was suspended "because [plaintiff] did not show that any relevant facts were concealed or that he was in any way misled by the government into delaying more than six years before filing this complaint." 529 F.3d at 1384. According to the Federal Circuit, "[i]t is a plaintiff's knowledge of the facts of the claim that determines the accrual date." *Id.* at 1385 (first citing *United States v. Kubrick*, 444 U.S. 111, 122 (1979) ("We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment."); and then citing *Catawba Indian Tribe v. United States*, 982 F.2d 1564, 1572 (Fed.Cir.1993) (declining to apply a later accrual date where "all the relevant facts were known. It was the meaning of the law that was misunderstood")). The court in *Young* found "[t]here is no suggestion that the Army concealed any fact that might be relevant to his claim that he should not have been discharged." *Id.* In this case, plaintiff attempts to distinguish *Young* by arguing, unlike Mr. Yifrach, the plaintiff in *Young* "was trying to game the system." Tr. at 117:17–19. The government surmises "the question is . . . whether . . . there's objective knowledge of a breach, [or, put another way,] objective knowledge that the [g]overnment isn't fulfilling its end of the bargain viewed from an objective scale. That's going to depend on a case-by-case basis." Tr. at 98:13–17. The Court therefore assesses plaintiff's knowledge of the facts to determine whether he was aware of his claim's accrual.

The FBI notably did not follow standard closing procedure in this case—plaintiff never received any formal notice his file was closed, nor did he sign any document acknowledging an understanding he was closed as a CHS. *See* Am. Compl. ¶ 79; Pl.'s Resp. at 19; Tr. at 84:12–14 ("THE COURT: What notice did plaintiff receive [that his CHS file was closed]? [PLAINTIFF]: None. I think I even half-jokingly said, 'By the way, until today, he still thinks he's a CHS,' because no one from the FBI formally sent him a letter asking him to sign any closing documents."). The government contends the FBI did not need to follow standard closing procedures because plaintiff was out of the country. Tr. at 97:7–9 ("THE COURT: . . . [D]o you agree that those *Guidelines* were not followed for closing? [THE GOVERNMENT]: Yes . . . , but I think the *Guidelines* weren't followed because it falls within the exception in paragraph 3 [of the *Guidelines*]."). The *Guidelines* state, "*if the Confidential Human Source can be located*, notify the Confidential Human Source that he or she has been closed as a Confidential Human Source and document that such notification has been provided." *Guidelines* § VII.A.3, Def.'s App. at 180 (emphasis added). The FBI's files, according to plaintiff, "do not say the CHS was

closed, only that they intended to close it." Pl.'s Resp. at 19 (citing Pl.'s Ex. L (6 Sept. 2012 "OIA Revocation"); Pl.'s Ex. M (11 Oct. 2012 "Source Closing Communication")); *see also* Tr. at 84:11–19. Although plaintiff is presumably aware of the *Guidelines*, *see Guidelines* § II.B.3, Def.'s App. at 156–57, his Amended Complaint does not point to any facts supporting a conclusion he was told of his closure. If plaintiff indeed was unaware of his closure because the FBI did not notify him he was closed pursuant to the exception in paragraph 3 of the *Guidelines*, *see Guidelines* § VII.A.3, Def.'s App. at 180, it is reasonable he may have been unaware his claim for breach of contract existed. *Martinez*, 333 F.3d at 1319. Construing all reasonable inferences in favor of plaintiff, the *Guidelines*' exception regarding not providing notice of closure to a CHS who cannot be located alone cannot support a conclusion plaintiff was aware of his closure in 2012 and any accrual of a breach of contract claim. *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) ("[I]n deciding . . . [a] motion to dismiss . . . the [C]ourt [i]s obligated to assume all factual allegations to be true and draw all reasonable inferences in [the non-movant's] favor.").

The government adds plaintiff "knew or should have known that the claim existed" when the government discontinued payments to plaintiff. Def.'s Reply at 7 (first quoting *Martinez*, 333 F.3d at 1319; and then citing *Young*, 529 F.3d at 1384); Tr. at 122:10–12 ("THE COURT: When did the claim accrue? . . . [THE GOVERNMENT]: When the payments stopped . . . ."). The last payment to Mr. Yifrach was August of 2012, and plaintiff confirms there was no payment after 6 September 2012. Tr. at 123:13–16; Tr. at 95:21–23. The government contends the FBI cannot guarantee a reward for providing information, unlike other federal agencies, such as the Internal Revenue Service (IRS) or the Department of Homeland Security (DHS), who may "guarantee any rewards, payments, or other compensation." *See* Tr. at 49:11–12 ("DHS might be able to guarantee things."); Tr. at 49:16–50:4 ("[The FBI] ha[s] no authority whatsoever to guarantee anything with regards to taxes."); *Guidelines* § II.B.2.e–g, Def.'s App. at 148–49 ("The FBI cannot guarantee any rewards, payments, or other compensation to the Confidential Human Source; In the event that the Confidential Human Source receives any rewards, payments, or other compensation from the FBI, the Source is liable for any taxes that may be owed; and No promises or commitments can be made, except by the United States Department of Homeland Security, regarding the alien status of any person or the right of any person to enter or remain in the United States."). In explaining the FBI's payment process, the government stated Confidential Human Sources "can get a reward based upon the information they've provided, but that reward is wholly discretionary." Tr. at 47:7–11. Once information is provided—even valuable information—the FBI pays informants in a manner similar to "the lottery" or "Wheel of Fortune." Tr. at 47:7–11; Tr. at 46:8–11; Tr. at 47:12–23 ("THE COURT: So it's like Wheel of Fortune? [THE GOVERNMENT]: Well, I mean, one assumes the government's going to act in good faith . . . but, yes, I mean, that's effectively -- . . . .") Plaintiff, on the other hand, posits his contract was ongoing: "[T]he contract's continuing, because as part of the contract, it was [understood plaintiff was] going to get a piece of the forfeitures, and as long as they keep making forfeitures on his information, he's going to get a piece of it. So, the payment could not have stopped because they continued making forfeitures and they continued making cases . . . ." Tr. at 110:6–12. In other words, plaintiff alleges he believed he would receive a windfall upon his return to the country in 2017. Plaintiff adds "[h]e was told specifically, if you need payment, if you want to get payment, come back to America. We can't pay you overseas." Tr. at 85:14–16. In drawing all reasonable inferences for the plaintiff, the Court cannot find from the facts above

plaintiff did not believe his contract claim accrued.  *See Henke*, 60 F.3d at 797 ("[I]n deciding . . . [a] motion to dismiss . . . the [C]ourt [i]s obligated to assume all factual allegations to be true and draw all reasonable inferences in [the non-movant's] favor.").

A conclusion in favor of plaintiff is additionally warranted considering his allegations of continuing contacts with the FBI.  Plaintiff contends his continued work for the FBI—through other state and federal agencies—suspended accrual of his claim.  Pl.'s Resp. at 21.  Plaintiff confirms after 6 September 2012 he was not paid by the FBI, but he does allege indirect contact through the California Department of Justice and the Department of Homeland Security.  Tr. at 95:21–96:3.  Plaintiff's Amended Complaint describes continuing relationships with a named special agent at the California Department of Justice, Division of Gambling Control, a named ICE agent, and a named FBI agent.  Am. Compl. ¶¶ 16, 82–83.  According to plaintiff, the continuous contacts with these various task force members through 2018 provide plaintiff "every plausible and reasonable belief that he was still working for the defendant."  Pl.'s Resp. at 21.  Plaintiff specifies in 2013, he was "contacted by [the] ICE agent . . . [who] tells Plaintiff she got his information from [the FBI] . . . [and] needed certain information."  Tr. at 103:24–104:3.  Plaintiff accordingly argues even if his case was closed, it "was reopened when he was contacted again . . . [by the agent who] hear[d] his name from the FBI."  Tr. at 127:1–7; Am. Compl. ¶ 81.  These allegations pertaining to continued secondary contacts with the FBI again reasonably point to plaintiff's belief his contract was ongoing or at least that he was in good standing with the FBI agents he dealt with prior to departing the United States.  Construing all allegations in favor of the non-moving party and making all reasonable inferences for the plaintiff, the Court finds plaintiff alleges sufficient facts he was unaware of his contract claim accrual after he was considered closed by the FBI.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a . . . motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint..") (citations omitted).  Based on the facts alleged in plaintiff's Compliant, he alleges a claim reasonably accruing sometime after the critical date in October 2018, and the Court accordingly denies the government's motion to dismiss pursuant to RCFC 12(b)(1).  *Id.*

## VII.   The Government's Motion to Dismiss for Failure to State a Claim Pursuant to RCFC 12(b)(6)

### A.   Whether the Court Should Treat the Government's RCFC 12(b)(6) Motion as a Motion for Summary Judgment Pursuant to RCFC 56

Plaintiff asks the Court to view the government's motion to dismiss pursuant to RCFC 12(b)(6) as a motion for summary judgment "[b]ecause the [d]efendant has asked the Court to consider matters outside of the pleadings in resolving the defendant's motion in this case, the Court should treat the defendant's motion as one for summary judgment."  Pl.'s Resp. at 14 (citations omitted).  RCFC 12(d) provides "if . . . matters outside the pleadings are presented to and not excluded by the [C]ourt" in connection with a motion under RCFC 12(b)(6), "the motion must be treated as one for summary judgment under RCFC 56."  RCFC 12(d).  "A decision on a motion for summary judgment, rather than on a motion to dismiss for failure to state a claim is proper where the parties rely on factual material beyond the allegations in the complaint."  *Zafer Taahhut Insaat Ve Ticaret, A.S. v. United States*, 120 Fed. Cl. 604, 608 (2015) (citing *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir. 2011)).  The Court ordered limited

19

discovery in this case, and the new facts ascertained from limited discovery are best analyzed with respect to the government's motion for summary judgment. The Court accordingly considers any new facts from limited discovery along with the government's motion for summary judgment *infra*. For completeness, however, the Court turns to the government's motion to dismiss pursuant to RCFC 12(b)(6), considering only facts available prior to limited discovery.

**B.      The Parties' Arguments**

The government contends plaintiff fails to allege formation of a contract with any government officials holding contracting authority. Def.'s MTD/MSJ at 26. The government states, "[f]or the purposes of our motion to dismiss for failure to state a claim, we focus [solely] upon the question of authority." Def.'s MTD/MSJ at 27 n.11. The government avers, "[s]pecifically, Mr. Yifrach fails to demonstrate that he entered into a contract with individuals with the authority to bind the United States to the purported contract, and Mr. Yifrach has not adequately pled that the alleged written agreement was ratified by any other official with authority and full knowledge of any alleged unauthorized promises." Def.'s MTD/MSJ at 26. The government argues plaintiff identifies neither state officials nor federal agents possessing actual authority to contract with a CHS. Def.'s MTD/MSJ at 30 (citing *Marchena v. United States*, 128 Fed. Cl. 326, 334 (2016)). According to the government, there is also no support "for the notion [the AUSA plaintiff names] possessed contracting authority to enter into an agreement with a non-criminal defendant to *investigate* criminal allegations." Def.'s MTD/MSJ at 30.

The government also alleges "admonition" provisions in the *Guidelines* show "the *Guidelines* cannot reasonably be construed as the basis for the FBI's purported authority." Def.'s MTD/MSJ at 32. The "admonition" provisions require agents to "review with the Confidential Human Source instructions as required by these Guidelines and other FBI policies." *Guidelines* § II.B.1–2, Def.'s App. at 147; *see* Tr. at 53:22–57:3. Additionally, the government asserts "the provisions of the *Guidelines* that allow for Department of Justice law enforcement agencies to make discretionary monetary payments to a CHS . . . do[] not discuss contractual authority." Def.'s MTD/MSJ at 32. The government states, "Although Mr. Yifrach now alleges that a generic, unnamed FBI 'Supervisor' signed his purported contract with the FBI, the *Guidelines* do not provide that any supervisor (whether or not they are a Senior Field Manager) possesses the authority to enter into a contract for the payment of over $2.5 million dollars tax free, along with the litany of other promises that Mr. Yifrach claims were contained in this supposed contract." Def.'s MTD/MSJ at 33. Addressing plaintiff's argument the Asset Forfeiture Fund provides the authority to contract, the government states, "[b]oth the Federal Circuit, and this [c]ourt have repeatedly noted that awards pursuant to the Asset Forfeiture Fund are discretionary, and that these statutes do not serve as a basis for the actual authority of special agents to grant awards to informants." Def.'s MTD/MSJ at 35 (citing *Aboo v. United States*, 86 Fed. Cl. 618, 627 (2009)).

Plaintiff responds by noting specific individuals with alleged actual contracting authority whom he claims signed his contract. Pl.'s Resp. at 22–24. Plaintiff purported signatories are: a named FBI agent; a named special agent with the California Department of Justice, Division of Gambling Control; an unnamed FBI Supervisor; a federal agent named "Rebecka," a named

AUSA, and the Director of the Arizona Department of Gaming.  Pl.'s Resp. at 2, 24.  Plaintiff also states, the "terms [of the agreement] had been approved by the U.S. Attorney General . . ., [a named] federal prosecutor . . . , and others within the Department of Justice responsible for the investigation."  Pl.'s Resp. at 23.  Notably, plaintiff states, the officers, agents, and Assistant U.S. Attorney "all had the authority to bind the United States in contract."  Pl.'s Resp. at 24.

Plaintiff also claims, "it was not just the FBI who[m] he would be working with."  Pl.'s Resp. at 2.  Plaintiff adds, "[e]qually as important and a fact that should not be glossed over, present at the meeting was a Hebrew/English translator who, despite [p]laintiff's fairly good working knowledge of English, was asked to translate everything into Hebrew for [pl]aintiff so that there would be no question as to what he was agreeing to."  Pl.'s Resp. at 2, 24.  Plaintiff adds:  "Defendant claims to have closed out Yifrach's CHS file on or about October 12, 2012 . . . , however, the law enforcement officials Yifrach were working with continued to contact him as if he was still working for [d]efendant and the file never closed."  Pl.'s Resp. at 3, 19.

Plaintiff quotes the following *Marchena* passage to illustrate an allegedly low-threshold requirement for plausibility of contract in this case:

> The Court finds that Marchena has met this low threshold requirement here. He alleges that he and the Government expressly agreed (mutuality of intent, offer, and acceptance) that he would serve as an informant in return for help in recovering money from the Battle asset forfeiture (consideration). Further, Marchena alleges that the agents with whom he interacted—Shanks and O'Bannon—had actual authority to bind the United States, and that AUSA Gonzalez also ratified the agreement and had authority to bind the United States. At the jurisdictional stage, this is all that is required to show a "non-frivolous allegation of a contract with the government."

Pl.'s Resp. at 9 (quoting *Marchena*, 128 Fed. Cl. at 331).  In *Marchena*, however, the court found the plaintiff "failed to plead . . . [an] agent with actual authority entered into a contract with him" and dismissed his case.  *Marchena*, 128 Fed Cl. at 334.  Plaintiff attempts to distinguish his case from *Marchena*, arguing "[p]laintiff here was to receive certain benefits and awards at the conclusion of the investigation," unlike *Marchena* where "the Government promised to 'use best efforts' to help Marchena recover his money."  Pl.'s Resp. at 30.  Plaintiff argues "[a] collective review of the allegations in the complaint supports a plausible and reasonable finding that the contract was approved and/or ratified by an official(s) with the necessary authority."  Pl.'s Resp. at 26.

## C.      Applicable Law

Plaintiff's Amended Complaint recites similar allegations to his 2019 case *Yifrach I*.  In dismissing plaintiff's 2018 Complaint, the Court outlined the relevant law for establishing a contract existed with the United States:

To state a claim for a government breach of contract, a plaintiff must plausibly allege the existence of a contract with the United States, which requires: "(1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance; and (4) actual authority on the part of the government's representative to bind the government." *Biltmore Forest Broad. FM, Inc.*, 555 F.3d at 1380 (citation omitted). These requirements are the same whether the plaintiff alleges an express or implied contract. *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). One who enters into an agreement with the United States "takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government, and this risk remains with the contractor even when the Government agents themselves may have been unaware of the limitations on their authority." *Id.* (citing *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947)). Moreover, plaintiffs have the burden of demonstrating the relevant government representative had actual authority to enter the alleged contract. *See, e.g.*, *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1432 (Fed. Cir. 1998) ("The burden was on [plaintiff] to prove that the [contracting officer] had the authority to enter into the . . . contract."); *see also Doe v. United States*, 48 Fed. Cl. 495, 501 ("The plaintiff bears the burden of proof with respect to the government agent's authority to enter into a contract on behalf of the government."). Further, "the government is not bound by the acts of its agents beyond the scope of their actual authority." *Id.* A plaintiff's belief that a government representative has authority is "irrelevant." *Id.* "Absent actual authority on the part of the Government's agent to bind the Government in contract, no binding contract can exist, *regardless of the agent's representations*." *Doe v. United States*, 100 F.3d 1576, 1584 (Fed. Cir. 1996) (emphasis added) (citing *Fed. Crop Ins. Corp.*, 332 U.S. at 383). Government agents must have actual authority to bind the government because "federal expenditures would be wholly uncontrollable if Government employees could, of their own volition, enter into contracts obligating the United States." *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990).

A government representative may have express or implied authority to contract. *See Salles v. United States*, 156 F.3d 1383, 1384 (Fed. Cir. 1998). "A government agent possesses express actual authority to bind the government in contract only when the Constitution, a statute, or a regulation grants it to that agent in unambiguous terms." *McAfee v. United States*, 46 Fed. Cl. 428, 435 (2000) (citing *Garza v. United States*, 34 Fed. Cl. 1, 17 (1995)), *appeal dismissed*, 243 F.3d 565 (Fed. Cir.) (unpublished table decision). A government representative's authority is "generally implied when such authority is considered to be an integral part of the duties assigned to a [g]overnment employee." *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989) (quoting J. Cibinic & R. Nash, *Formation of Government Contracts* 43 (1982)). "The word integral has been interpreted to mean 'essential' or 'necessary to form a whole.'" *Roy v. United States*, 38 Fed. Cl. 184, 189 (1997) (quoting *Cruz-Pagan v. United States*, 35 Fed. Cl. 59, 61 (1996)), *appeal dismissed*, 124 F.3d 224 (Fed. Cir.) (unpublished table opinion). "[Contracting] [a]uthority is integral 'when the government employee

could not perform his or her assigned tasks without such authority.'" *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1402 (Fed. Cir. 2016) (quoting *Flexfab, LLC v. United States*, 62 Fed. Cl. 139, 148 (2004), *aff'd*, 424 F.3d 1254 (Fed. Cir. 2005)).   Contracting authority is also integral "when the relevant agency's regulations do not grant the authority to other agency employees." *SGS-92-X003 v. United States*, 74 Fed. Cl. 637, 652 (2007) (citing *Leonardo v. United States*, 63 Fed. Cl. 552, 557 (2005), *aff'd*, 424 F.3d 1254 (Fed. Cir. 2005)).   "[A] person with no actual authority may not gain actual authority through the court-made rule of implied actual authority." *Cal. Sand & Gravel, Inc. v. United States*, 22 Cl. Ct. 19, 27 (1990), *aff'd*, 937 F.2d 624 (Fed. Cir. 1991) (per curiam), *cert. denied* 502 U.S. 1057 (1992).

> This Court has found multiple times in the past that "contracting authority is not an integral part of the duties of federal law enforcement officers when dealing with confidential informants or cooperating witnesses since such officers can obtain authority from higher-ranking officers via established procedures to pay informants and witnesses for their services, with the result that contracting authority is not needed for the agents to perform their jobs." *Gary v. United States*, 67 Fed. Cl. 202, 214 (2005); *see also Roy*, 38 Fed. Cl. at 190 (1997) ("Because contracting authority is not integral to FBI [Special Agents'] informant responsibilities, the doctrine of implied actual authority is inapplicable to the facts of the case at bar.").

*Yifrach I*, 145 Fed. Cl. 691, 698–99 (2019), *aff'd*, 825 F. App'x 899 (Fed. Cir. 2020) (mem.).

### D.   Whether Plaintiff Plausibly Alleges He Entered into a Valid Contract with the United States

Plaintiff alleges he entered an express contract, or alternatively, an implied-in-fact contract with the United States.  Am. Compl. ¶¶ 102–06.  To state a claim upon which relief may be granted, plaintiff must plausibly allege each element of a contract with the United States:  "(1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance; and (4) actual authority on the part of the government's representative to bind the government." *Biltmore Forest Broad. FM, Inc.*, 555 F.3d at 1380 (citation omitted).  The government argues plaintiff does not plausibly allege the government representatives who signed the contract had the requisite actual authority to contract on behalf of the government.  The Court must therefore decide whether plaintiff's allegations plausibly allege individuals signed the alleged agreement who possessed actual contracting authority.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) ("[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" (emphasis added)).

Plaintiff contends he contracted with "the government" broadly, with "the blessing of [the Attorney General]," as opposed to specifically with the FBI; plaintiff details he worked for the Task Force Organization, a conglomeration of state and federal agencies.  *See* Tr. at 107:6–9 ("It was all one big contract for the Task Force, and the Task Force included FBI and state officials and even the Bureau of Indian Gaming Affairs."); Tr. at 144:14–15.  In his Amended

23

Complaint, plaintiff alleges, among other individuals, the AUSA possessed implied authority. Pl.'s Resp. at 24.  Plaintiff argues the implied authority distinguishes this case from *Gary*, where this court held "contracting authority is not an integral part of the duties of federal law enforcement officers when dealing with confidential informants or cooperating witnesses since such officers can obtain authority from higher-ranking officers via established procedures to pay informants and witnesses for their services, with the result that contracting authority is not needed for the agents to perform their jobs."  *Gary v. United States*, 67 Fed. Cl. 202, 214 (2005) (holding FBI special agents and AUSAs lacked actual authority to bind the government to alleged contract whereby the government would compensate plaintiff for any business losses he sustained as a result of his cooperation in investigation); Tr. at 148:14–18; *see also, e.g.*, *Roy*, 38 Fed. Cl. at 190 (1997) ("Because contracting authority is not integral to FBI [Special Agents'] informant responsibilities, the doctrine of implied actual authority is inapplicable to the facts of the case at bar.").  The government states there is no guideline preventing an AUSA from entering into a contract—but also nothing definitively providing them with authority.  See Tr. at 136:20–137:2 ("THE COURT:  So, what rule or guideline specifies AUSAs do not have authority?  [THE GOVERNMENT]:  Your Honor, I am just not aware of anything providing them with authority.  I don't know of a guideline that says they—they generally can't enter into contracts, but I haven't seen any evidence that they can and any evidence that it's integral to their duties in the context of an FBI investigation.").  The government is also unaware of the ability of AUSAs to be delegated authority, "but there would be documentation if there was such a delegation."  Tr. at 150:3–4.

Plaintiff must only state one plausible allegation regarding contracting authority, and plaintiff claims a particular Assistant U.S. Attorney had actual authority to contract with an informant.  *Iqbal*, 556 U.S. at 678.  The government did not supply any definitive position on whether someone in an official career civil service position in the U.S. Department of Justice composed of lawyers working under the U.S. Attorney of each U.S. federal judicial district has contracting authority, responding "I don't know" when asked "Is it possible that an AUSA could have authority?"  Tr. at 149:25–150:2.  The question of whether officials have actual authority is a mixed question of law and fact.  Looking to the facts in plaintiff's Amended Complaint, the Court concludes it is plausible at least some of the individuals alleged by plaintiff to have authority did, in fact, possess contracting authority.  Accordingly, accept[ing] "well-pleaded factual allegations" as true and drawing all reasonable and "plausible inference[s]" in favor of plaintiff, the Court finds Mr. Yifrach alleges "enough facts to state a claim to relief [regarding his breach-of-contract claim] that is plausible on its face."  *Iqbal*, 550 U.S. at 1940, 1952; *Twombly*, 550 U.S. at 570; *see also Athey v. U.S.*, 908 F.3d 696, 705 (Fed. Cir. 2018) (quoting *Call Henry, Inc. v. U.S.*, 855 F.3d 1348, 1354 (Fed. Cir. 2017)) (When deciding a Rule 12(b)(6) motion to dismiss, the Court "must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant.").

## VIII.   The Government's Motion for Summary Judgment Pursuant to RCFC 56

Although the Court finds plaintiff's Amended Complaint plausible on its face, the parties agreed to a stay for limited discovery, and have since supplemented the record with additional documents.  *See* 14 Dec. Oral Argument Tr., ECF No. 61, at 92:12–17; 15 Dec. 2021 Order. Despite the limited discovery, the parties maintain their disagreement over whether individuals

identified in plaintiff's Amended Complaint hold the requisite authority to contractually bind the government, and the Court now considers the supplemented record under the summary judgment standard.

Plaintiff avers defendant does not argue the March 2012 meeting never took place, "[d]efendant only submitted an affidavit from [an] FBI Agent stating that the Delta [informant file] records pertaining to plaintiff do not reflect that any service or contractual agreement was entered into the plaintiff's case log." Pl.'s Resp. at 29 (citing Def.'s App. at 108 (Declaration of DHS Agent)). Plaintiff continues, "[t]hat is not the same thing as saying there was never a signed contract, only that it was never entered into the log." Pl.'s Resp. at 29. Plaintiff further argues although there is no written document, there are "references" to a contract. *See* Tr. at 25:1–7. Specifically, plaintiff cites to a 22 June 2012 "Payment Request," which states "[a] services agreement is in process that will provide enough payments for CHS to stop reimbursement of residential [expenses] . . . ." Pl.'s Ex. G (22 June 2012 "Payment Request"); Tr. at 25:1–6 ("[PLAINTIFF]:  [T]here is reference in some of the documents . . . that . . . 'a services agreement [is] to be provided.' So, there was definitely thought of writing one, and I believe that one was written."). The payment request documents an FBI agent's request for a "regular type of payment." Tr. at 65:14 (citing Pl.'s Ex. G (22 June 2012 "Payment Request")). The government agreed it is "reasonable, though, or at least plausible to deduce the FBI agent has presumably engaged with plaintiff on this [agreement]." *See* Tr. at 66:2–8 (citing Pl.'s Ex. G (22 June 2012 "Payment Request")). At oral argument, the Court contextualized the reference to a services agreement, noting:

> [O]ne option is that the FBI agent said, "Hey, I'm not sure if I can get coverage for this, I'll give it a go," and then submits the request, and it gets denied, and then follows up again and says, "Sorry, it didn't work out."

> Another option is, "Don't worry, we got it, we're going to cover your rent," submits for it, and then it doesn't get approved, and then goes quiet [without ever informing the informant of the approval-failure].

Tr. at 67:4–12. The government responded, "I would hope it would be the first option, but it's possible that theoretically it could be the second option." Tr. at 67:13–15.

The government broadly described the services agreement formation process. According to the government:

> The protocols that were in place in 2012 included any contract where a CHS required consultation with the applicable field office's chief division counsel and special agent in charge, the appropriate FBI headquarters substantive unit, and the FBI's Office of General Counsel, . . . Director of Intelligence personnel, and, where applicable, the United States Attorney's Office. Upon receiving concurrence from the above stakeholders, the [Director of Intelligence] then forwards an approved services agreement to a Contracts Review team within the procurement section of the FBI's Finance Division. If a contract review team approves of the contract, the

contracting officer within the contract, the review teams will execute it, and only a contracting officer may sign the services agreement with the CHS.

Tr. at 28:1–17. The government explains there was contemplation about involving a contracting officer for drafting a services agreement with plaintiff, but it was only a discussion in June 2012 and never came to fruition. *See* Tr. at 29:18–30:10. The government clarified, "[i]t appears that the agent never actually bothered to move forward with [an agreement]. I don't know why. There's not a reason documented in the file." Tr. at 30:1–3. An FBI contracting officer has contracting authority, *see* Tr. at 137:10–12, and one appeared to at least be in contact with plaintiff, Tr. at 30:11–14. As the Court stated in *Yifrach I*, however, "[w]hether or not the agreement was written . . . does not change the requirement that the government representative who enters the agreement must have actual contracting authority." *Yifrach I*, 145 Fed. Cl. at 702 (citing *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("A contract with the United States . . . requires that the Government representative who entered or ratified the [written] agreement had actual authority to bind the United States.")).

Plaintiff contends the facts in the supplemented record support an inference attendees of a March 2012 meeting in Phoenix, Arizona possessed implied actual authority. Plaintiff specifically notes the Attorney General at the time, a particular AUSA, and other named federal and state agents possessed authority to contract on behalf of the United States. Pl.'s Resp. at 23–24. The government argues plaintiff fails to demonstrate any of the named individuals possessed actual contracting authority. Def.'s MTD/MSJ at 35–36. The government reiterates, absent actual authority on the part of the government's agent to bind the government in contract, no binding contract can exist, regardless of a federal agent's representations. *Id.* at 27; *See Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 383 (1947) (acknowledging those who contract with the government bear the risk of having accurately ascertained that the government's representative acts with actual authority to bind the government); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990) (holding government representative must have actual authority to bind the government in contract, to support implied-in-fact contract claim). Considering a government agent possesses implied actual authority "when such authority is considered to be an integral part of the duties assigned to a government employee[,]" the Court first examines each federal and state position plaintiff alleges has procurement authority in turn *infra* before analyzing the evidence of a contract between the government and plaintiff. *See H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989) (internal citations and quotation marks omitted).

A.      **Evidence of Authority to Contract**

      i.      **Attorney General Eric Holder**

The parties dispute the nexus between the Attorney General and plaintiff's alleged contract. Plaintiff claims "[i]n March of 2012, [Mr.] Yifrach was invited to a meeting at the FBI offices in Phoenix, Arizona to finalize a formal agreement which terms had been pre-approved by the U.S. Attorney General[]." Pl.'s Resp. at 1. Plaintiff notably does not contend the Attorney General signed the contract; he is alleged to have only "agreed" to it. Tr. at 135:2–5 ("THE COURT: But you agree that there's no allegation that [the] Attorney General . . . would

have signed anything?  [PLAINTIFF]:  . . . [H]e agreed to it.").  The government maintains "there's no evidence of [the Attorney General's] participation."  Tr. at 136:15–16.  Plaintiff does not contend he has any personal knowledge of the former Attorney General's purported participation in his case.  *See* Pl.'s Resp. at 30.  The Court granted limited discovery on the issue of authority, but plaintiff is still unable to point to facts supporting an inference the Attorney General approved or was even aware of plaintiff's alleged contract.  Tr. at 144:11–21 ("THE COURT:  And then what connectivity is there that Attorney General Holder was part of any of the authority for this?  [PLAINTIFF]:  [A particular FBI agent] told my client, 'This has the blessing of [the Attorney General].'  . . . THE COURT:  Okay. But there're no . . . signatures of [the] Attorney General . . . on any of the documents.  [PLAINTIFF]:  No.");  *see infra* Section IX.C; Tr. at 20:20–21:5 ("THE COURT:  . . . [F]rom the government's perspective, all relevant documents, either in FBI files or AUSA files, have been produced?  [THE GOVERNMENT]: That is correct, Your Honor.  THE COURT:  . . . [F]rom plaintiff's perspective, other than the suspicion that there might have been a document destroyed, you have no reason to assume that there were any files that . . . have not been searched for and found?  [PLAINTIFF]:  Correct."). "[E]ntry of summary judgment is appropriate against a [party] 'who fails to make a showing sufficient to establish the existence of an essential element to [its] case, and on which [it] will bear the burden of proof at trial.'" *Zafer Taahhut Insaat ve Ticaret A.S. v. United States*, 833 F.3d 1356, 1362–63 (Fed. Cir. 2016) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting *Catrett v. Johns-Manville Sales Corp.*, 756 F.2d 181, 184 (D.C. Cir. 1985), *rev'd sub nom. Celotex Corp. v. Catrett*, 477 U.S. 317 (1986))) (third and fourth alterations in original). Plaintiff has not presented any evidence supporting his claim the Attorney General authorized his contract, and the parties agree there are no additional documents which would support a finding of authority.  There is accordingly no genuine issue of material fact related to the Attorney General's participation in contracting with plaintiff.  *Id.*

ii.      **Assistant United States Attorney**

Plaintiff further alleges a particular AUSA had contracting authority and authorized plaintiff's contract.  *See* Pl.'s Resp. at 24; Tr. at 134:23–25 ("THE COURT:  . . . [Plaintiff], can you specify exactly who is alleged to have contract authority?  [PLAINTIFF]:  [An Assistant U.S. Attorney] . . . ."); Tr. at 135:6–8 ("THE COURT:  . . . [Y]our allegation is that the Assistant U.S. Attorney would have authority?  [PLAINTIFF]:  Correct.").  The government characterizes this proposition as "futile."  Def.'s Reply at 15 n.6.  The government maintains an AUSA does not have either implied or express contracting authority.  Tr. at 145:17–20.  The government explains the AUSA has a "limited role in the case" and is consulted in the closing of the CHS— but not actually closing the CHS.  See Tr. at 149:3–24 (citing Def.'s App. 125–27 (Letter to FBI from AUSA; Letter to ASUA from FBI)).

The government reasserts plaintiff provides no evidence of authority.  *See* Tr. at 137:3–7 ("[THE GOVERNMENT]:  Plaintiff has the burden of demonstrating . . . authority, and we've seen nothing in what they've cited that provides an AUSA has that authority, to affirmatively rebut something when there's nothing there, so . . .").  The government is unable to articulate whether the AUSA could be delegated authority.  *See* Tr. at 149:25–150:14; Tr. at 136:20–23 ("THE COURT:  So, what rule or guideline specifies AUSAs do not have authority?  [THE

GOVERNMENT]:  Your Honor, I am just not aware of anything providing them with authority.")

Plaintiff claims—notwithstanding the lack of evidence related to AUSA contracting authority or contract documentation—(1) the AUSA had authority; (2) the AUSA attended the meeting where the alleged contract materialized; and (3) the circumstances create a contract.  *See* Tr. at 139:25–140:22.  Plaintiff's "failure of proof concerning the existence of an element essential to [his] case on which [he] will bear the burden of proof at trial[—actual authority on the part of the government's representative to bind the government—]necessarily renders all other facts immaterial[, however,] and entitles the moving party to summary judgment as a matter of law."  *See Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994).  The statutory duties of an AUSA, in pertinent part, are to:  (1) prosecute all offenses against the United States; (2) represent the government in civil actions concerning the United States, and (3) institute and prosecute proceedings for the collection of fines, penalties, and forfeitures.  *See* 28 U.S.C. §§ 542, 547.  Federal regulations authorize AUSAs to enter formal agreements in settling civil claims against the United States.  *See* 28 C.F.R. §§ 0.160, 0.161, 0.168.  These regulations do not, however, indicate an AUSA has the authority to authorize a contract of the kind plaintiff alleges.  Neither the statutes nor the regulations identify duties impliedly authorizing AUSAs to contract with a CHS  Plaintiff has not pointed to any facts or law supporting his theory the AUSA he identifies authorized his contract.  Plaintiff makes no allegation, and the facts do not suggest anything that would support the conclusion:  authority to make binding contracts for informants is "an integral part of the duties assigned to [AUSAs]."  *See H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989) (internal citations omitted).

### iii.     Federal Agents (an Unnamed FBI Supervisor and Two Named FBI Agents)

The parties further disagree whether FBI agents have the authority to enter into contracts on behalf of the United States.  Plaintiff claims the federal agents who allegedly signed the agreement, including an unnamed FBI Supervisor and two named FBI agents, possess actual authority to contract with plaintiff.  *See* Pl.'s Resp. at 2, 24.  The government, on the other hand, maintains "[a]s a general rule, not only do FBI agents not have the authority to enter into contracts, but there is an institutional reason not to."  Tr. at 25:21–23; Def.'s Reply at 29.

This court consistently holds Federal law enforcement agents lack both actual express and actual implied authority to contract with confidential informants.  *See Aboo v. United States*, 86 Fed. Cl. 618, 627–28 (2009); *Humlen v. United States*, 49 Fed. Cl. 497, 503–04 (2001); *Gary v. United States*, 67 Fed. Cl. 202, 213–14 (2005); *Roy v. United States*, 38 Fed. Cl. 184, 188 (1997).  Furthermore, the Court previously determined plaintiff's similar allegations in *Yifrach I* were analogous to those of *Marchena*.  *See Yifrach I*, 145 Fed. Cl. at 701–02 (citing *Marchena v. United States*, 128 Fed. Cl. 326, 333 (2016)).  In *Marchena*, the plaintiff alleged a particular AUSA and several other unnamed officials ratified an agreement with the government.  *See Marchena*, 128 Fed. Cl. at 333–34.  The *Marchena* court stated "pleading that certain officials had actual authority is a legal conclusion that this Court is not bound to accept as true."  *Id.*  The Court addresses the agents plaintiff names, in light of limited discovery.  Generally, "contracting

authority is not an integral part of the duties of federal law enforcement officers when dealing with confidential informants or cooperating witnesses since such officers can obtain authority from higher ranking officers via established procedures to pay informants and witnesses for their services, with the result that contracting authority is not needed for the agents to perform their jobs." *Yifrach I*, 145 Fed. Cl. at 705 (quoting *Gary v. United States*, 67 Fed. Cl. 202, 214 (2005)).  At oral argument, plaintiff was unable to identify any case law rendering the opposite conclusion.  *See* Tr. at 151:4–10.  Furthermore, plaintiff points to no additional facts post-discovery indicating these two individuals were authorized by someone with contracting authority.  Without plaintiff pointing to additional facts to support this inference, there is no question of material fact remaining as to whether the agents plaintiff named possessed contracting authority—they did not.  *See Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1432 (Fed. Cir. 1998) (indicating the fact plaintiff "may have believed that the [contracting officer] had authority is irrelevant"); *see also Sahagun-Pelayo v. United States*, 602 Fed. App'x 822, 825 (Fed. Cir. 2015) ("[T]o the extent [plaintiff] *believed* that an unidentified government official . . . possessed the authority to enter into a contract with him, that subjective belief is insufficient because *actual* authority—not just *apparent* authority—is required to contract." (emphasis in original)).[4]

### iv.     State Agents (of the California Department of Justice Division of Gambling Control and the Arizona Department of Gaming)

The parties further diverge regarding state agents' authority to contract.  Plaintiff claims state law enforcement officials—including a named special agent of the California Department of Justice Division of Gambling Control and the Director of Arizona Department of Gaming at the time—possessed actual authority to bind the United States in contract.  Pl.'s Resp. at 5–6, 28.  According to plaintiff, "[i]t was clear that [plaintiff] would be working with all these law enforcement[] person[nel] in conjunction with his work for the FBI."  *Id.* at 2.  Exhibits to plaintiff's Response indicate both of these individuals worked with plaintiff in the FBI case he is alleged to have contributed to.  *See, e.g.*, Pl.'s Resp. Ex. H at 31.  The government, however, notes the claim these officials "would have actual (express or implied) authority to bind the United States in contract . . . is without any support."  Def.'s MTD/MSJ at 30.  Plaintiff did not provide any cases, statutes, regulations, or other authority holding federal contracting authority may rest with state law enforcement officials in this context, nor does his Amended Complaint provide any basis for the Court to make such a finding.  As with other allegations, after limited discovery, plaintiff has not pointed to any evidence supporting an inference these officials possessed authority or were authorized to contract with plaintiff.  Without plaintiff's presentation of additional evidence or law supporting his allegations, there is no material dispute over whether these individuals possessed contracting authority.  *See Yifrach I*, 145 Fed. Cl. at 701–05; *Marchena*, 128 Fed. Cl. at 334 (stating law enforcement officials cannot have actual authority to bind the United States to contract); *see also City of El Centro*, 922 F.3d at 820 (citing *Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384 (1947)) (reiterating the requirement for actual authority of the individual contracting on behalf of the United States)

### v.      Conclusion

---

[4] As noted previously in *Yifrach I*, the facts of this case ring similar to other confidential informant breach of contract cases.  *See infra* Section VIII.B.vi.

While allegations of the AUSA's participation in the alleged contract are enough to withstand a motion to dismiss, limited discovery resulted in no additional facts supporting a genuine dispute as to whether plaintiff held a valid contract with the government. *See Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1404 (Fed. Cir. 1984) ("A mere assertion that . . . fact issues exist is insufficient to avoid summary judgment."). Plaintiff fails to carry his burden in establishing authority of the Attorney General, AUSA, and federal and state agents. Absent actual authority on the part of the government's agent to bind the government in contract, no binding contract can exist. *See Federal Crop Ins. Corp.*, 332 U.S. at 383 (1947); *City of El Centro v. United States*, 922 F.3d 816, 820 (Fed. Cir. 1990).

## B.      Existence of a Contract

The parties disagree whether contextual facts demonstrate the existence of a contract. Plaintiff admits he does not have any direct evidence of a contract. Tr. at 140:23–25 ("THE COURT:  [Y]ou're a couple steps removed from having evidence of a contract[?] [PLAINTIFF]:  Correct."). The government accordingly maintains a contract never came to fruition. *See* Def.'s Reply at 14 ("[W]hile the United States has not produced any declarations regarding the alleged contract meeting (and the fact that the written contract does not exist), our motion focuses upon the question of authority, not the fact that the contract does not exist (even though it does not) and the alleged meeting did not happen (even though it did not)."); Tr. at 109:6–7 ("[THE GOVERNMENT]:  . . . [W]e want to make clear that this contract doesn't exist. There is no such contract."). Plaintiff alleges the existence of both an oral contract and a written contract with the Task Force Organization, which was either destroyed or is being withheld. Tr. at 24:14–19 ("[PLAINTIFF]:  Well, I believe that there was an oral contract. I believe that there was a written contract, that it either was destroyed or it's being withheld . . . ."); *see* Pl.'s Resp. at 1 ("It was clear that the FBI was working in coordination with these other law enforcement officials in a joint task force."); *id.* at 24 ("It was clear that Yifrach would be working with all these law enforcements personnel as part of a joint task force; it was not just the FBI who Yifrach would be working with."). Plaintiff asserts the absence of a documented contract "does not mean a contract never existed." Pl.'s Resp. at 25. Plaintiff reasons it was "all one big [interagency] contract" including the FBI, state officials, and the Bureau of Indian Gaming Affairs. Tr. at 107:3–9; Tr. at 57:17–58:9 ("[PLAINTIFF]:  Well, it was a multistate operation between California and Arizona . . . .  It was Homeland Security as well, because in order for him to get into the country, Homeland Security had to be involved with that as well. . . .  In terms of a contract, it would be the FBI, Homeland Security, [Immigration and Naturalization Service] probably as well.  They all had to be in agreement with him coming in to work for the FBI."). Plaintiff contends the Task Force Organization contract was against FBI policy because the promises made were in violation of the *Guidelines*. *See* Tr. at 83:4–84:10 ("THE COURT:  So, what was the violation of the procedure, then?  [PLAINTIFF]:  . . . I mean, there were a lot of promises made here that obviously, if you read the manual, of course, they couldn't fulfill those promises . . . .  So, yes, they violated their rules. . . . [T]hey're violating their own rules."). Specifically, plaintiff contends items indicate the existence of a contract:  (1) opening paperwork, including a Memorandum of Admonishments; (2) contemplation of a Services Agreement; (3) execution of Otherwise Illegal Activity Agreements; (4) compensation of expenses; and (5) the lack of a proper CHS closure.

###### i.   Opening Paperwork

Plaintiff suggests a Memorandum of Admonishments, which "provide[s] guardrails on things that an individual can or cannot or must do when they enter into this arrangement or agreement or setup with the FBI," Tr. 59:10–18, is part and parcel of the contract the government breached.  *See generally* Tr. at 52:11–57:3 (explaining the process of confirming receipt and understanding of a Memorandum of Admonishments); *supra* Section V.B (describing the process of opening a CHS pursuant to *Guidelines* § II.B).  In particular, plaintiff references *Guidelines* Section II.B.3, which states "[i]mmediately after these instructions have been given, the FBI Agent shall require the Confidential Human Source to acknowledge his or her receipt and understanding of the instructions."  The government points to documents of "CHS Admonishments" provided to plaintiff by an agent.  *See* Tr. at 51:4–9 (citing Def.'s App. at 111–14 (CHS Admonishments)).  While both parties agree plaintiff received a list of instructions on 20 April 2012, they dispute plaintiff's acknowledgement of receipt and his understanding of them.  *See* Tr. at 53:9–21.  Plaintiff specifically questions the absence of a signature and translator affiliated with the Memorandum of Admonishments.  The government "belie[ved]" a signature page was presented with the Memorandum, but alleged it may have be missing from the record.  Tr. at 56:12–24 ("THE COURT:  . . . [I]t's the government's position that there was a signature page that Mr. Yifrach signed but that's not in the record?  [THE GOVERNMENT]: It's my belief that there is a signature page, but, again, that's my recollection as I sit here today. . . .  THE COURT:  . . . [B]ut under your interpretation of the instructions, there's no signature page required?  [THE GOVERNMENT]: No, it's not required.").  When asked whether plaintiff acknowledged his receipt and understanding of the instructions, the government answered affirmatively, despite the lack of a translator being present or a signature in the record.[5]

---

[5] Section II.B.3–4 of the *Guidelines* specify:

> 3. The content and meaning of each of the foregoing *instructions must be clearly conveyed* to the Confidential Human Source. Immediately after these instructions have been given, the FBI Agent shall require the Confidential Human Source to acknowledge his or her receipt *and understanding of the instructions*. The FBI Agent, and the additional Agent or other government official present as a witness, shall document that the instructions were reviewed with the Confidential Human Source and that the Source acknowledged the instructions *and his or her understanding of them*. As soon as practicable thereafter, an FBI Supervisor shall review and, if warranted, approve the documentation.
> 4. The instruction and documentation procedures shall be repeated to the Confidential Human Source whenever it appears necessary or prudent to do so, and, in any event, at least annually.

*Guidelines* § II.B.3–4 (emphasis added).  The *Guidelines* place an emphasis on both clearly conveying the instructions and on the CHS understanding the instructions.  Despite this emphasis, there was no translator present at this meeting, even though there are allegations of a translator being present at a prior meeting.  Tr. at 55:6–11.  Proper documentation is essential in showing a CHS understood the instruction in compliance with the Guidelines, and the government is unable to provide a signature page as evidence of their compliance.  Tr. at 54:18–25 ("[THE GOVERNMENT]: No, I don't believe that requires a signature.  I see they are calling it a signature page, but, again, that was not provided to the Court, and I would have to look for that in the production.  There's a gap . . . in terms of the Bates numbers, which makes me believe that there may be a signature page or some sort of signature, but I cannot state that for a fact right now."); Tr. at 53:4–8 ("[THE GOVERNMENT]:  Your Honor, I do believe there's a signature page, but we did not provide it to the Court. If the Court requires it, we will be more than happy to provide it or tell the Court that, indeed, there is no signature page.").

Tr. at 55:12–20; 55:6–11 (citing Def.'s App. 112, 114 (CHS Admonishments)).  Despite the lack of a signature page, the *Guidelines* do not indicate a confirmation signature is required.  Furthermore, there is no indication in the record plaintiff did not accept and understand the admonishments.  The evidence in the record instead only supports an inference these admonishments were provided to plaintiff.  *See* Def.'s App. at 111 (CHS Admonishments).  The Court, assessing the evidence in the record, finds the Memorandum of Admonishments is part of FBI procedure and not a contract in itself, and the lack of a signature page therefore cannot support any inference a contract existed.  *See Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990) ("To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government and entitle the plaintiff to money damages in the event of the government's breach of that contract.").

      **ii.    Services Agreement**

      Plaintiff also references a 27 March 2012 Service Agreement as evidence of existence of a contract.  *See* Pl.'s Resp. at 3; Tr. at 24:21–25:7.  The government explains although there was discussion of entering into a services agreement with plaintiff, the services agreement never materialized because "the agent never actually bothered to move forward with [it]."  Tr. at 29:18–30:10 ("[THE GOVERNMENT]:  . . . Exhibit G provides . . . a services agreement in process.  It will provide for enough payment for the CHS to stop reimbursement of residential rent and utilities.  That's typically what we would use a services agreement for. . . .  It appears that the agent never actually bothered to move forward with that.  I don't know why.  There's not a reason documented in the file . . . .") (citing Pl.'s Ex. G ("22 June 2012 FBI Payment Request")).  The government adds Service Agreements are used sparingly but confirms they do create a contract if executed by a contracting officer.  *See* Tr. at 27:8–25.  Plaintiff argues no Service Agreement materialized before or during limited discovery because it has not been located by the government, and a copy was not provided to plaintiff because plaintiff's previous attorney was denied entry to the United States to attend the meeting where discussions alluding to a Service Agreement were held.  Pl.'s Resp. at 3.  "Plaintiff's counsel was refused entry to the United States on March 27, 2012, intentionally depriving plaintiff of his choice of counsel to be present at this meeting in Phoenix and receive a copy of the executed contract, which has disappeared from the defendant's files."  Pl.'s Resp. at 3.  The government explained plaintiff's original attorney from Israel returned to Israel after being questioned by authorities upon arriving in New York City, New York—but did so voluntarily.  Tr. at 138:18–19 ("[THE GOVERNMENT]:  . . .  [T]he FBI's understanding is [plaintiff's original attorney] went back voluntarily . . . .").  As indicated *supra*, the FBI never signed a services agreement with plaintiff—one was proposed but never completed.  *See* Tr. at 30:1–10 ("[THE GOVERNMENT]:  It appears that the agent never actually bothered to move forward with [an agreement].  I don't know why.  There's not a reason documented in the file.").  After limited discovery, plaintiff still fails to produce any evidence of the existence of an executed Services Agreement.  Plaintiff cannot rely on a partially formed Services Agreement to show the existence of a contract.  The parties agree the document-based record is complete, and plaintiff has not pointed to any documents in the record indicating a dispute of material fact as to the lack of a services agreement.  *See Ransom*, 900 F.2d at 244 ("To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the

government and entitle the plaintiff to money damages in the event of the government's breach of that contract.").

### iii.    Otherwise Illegal Activity Agreements

Plaintiff also identified two OIA agreements, which permit the FBI to authorize confidential informants to engage in activities that would otherwise constitute crimes under state or federal law if engaged in by someone without such authorization, to support his argument a contract existed.  *See generally* Tr. at 129:12–134:25 (describing the OIA process).  The government acknowledges the existence of two OIA agreements with plaintiff but explains the OIA formation process to showcase they are not agreements between the FBI and plaintiff— rather, they are agreements between the FBI and the relevant federal prosecuting offices to engage in an illegal activity without fear of prosecution.  Tr. at 130:16–131:7; Tr. at 131:12–24.  Plaintiff agrees with the government's characterization of the OIA agreements.  Tr. at 134:1–4 ("THE COURT:  . . . [I]s there anything else that's worthy of discussion [about OIA agreements]?  [PLAINTIFF]:  No.").  The OIA agreements are not between plaintiff and the government; they therefore fail to confer a contractual obligation with plaintiff.  Plaintiff therefore has not argued any documents related to OIA agreements evidencing a dispute of material fact regarding an alleged contract.  *See Ransom*, 900 F.2d at 244 ("To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government and entitle the plaintiff to money damages in the event of the government's breach of that contract.").

### iv.    Compensation

Plaintiff presents a "Payment Receipt," which he claims is indicative of a salary and further substantiates a contractual relationship with the government.  *See* Tr. at 63:12–25 (citing Pl.'s Ex. G ("22 June 2012 FBI Payment Request")).  Plaintiff alleges "he was promised money, he was promised benefits, he was promised performance bonuses . . . .  He was made a lot of promises[.]  That makes a lot more sense than we don't have a contract with him [and] we don't want to give him any money."  Tr. at 63:12–64:4.  The government explained at oral argument the *Guidelines* contemplate compensation for expenses—not a salary.  Tr. 58:17–22; Tr. 60:20– 21 ("THE GOVERNMENT]:  . . . I think 'salary' would be an incorrect term . . . .").  The "Summary Reports" are receipts for payments to plaintiff pursuant to the "voucher system" required by the Guidelines.  Tr. at 69:16–21 (first citing Def.'s App. at 116 (Quarterly Supervisory Source Report); and then citing App. to Def.'s Reply at 1–5 (FBI Payment Request), ECF No. 76-1); Tr. at 70:3–71:4; Tr. at 77:7–78:2.  The government argues in this case "'salary' would be an incorrect term [because] . . . salary indicates . . . a term of art that is a more enforceable, longer term arrangement or right, rather than . . . a 'pay-to-play' . . . situation that frequently CHSs have to abide by."  Tr. at 60:20–25.  Plaintiff counters "[t]here had to be a salary—you can call it salary, you can call it rewards, you can call it payments, you can call it compensation[;] I don't care what word in the thesaurus you come up with, but he didn't give up his life to move into an apartment in Arizona for free . . . .  He did this because he was promised money, he was promised benefits, he was promised performance bonuses. . . .  He was made a lot of promises[.]  That makes a lot more sense than we don't have a contract with him [and] we don't want to give him any money."  Tr. at 63:12–25.  The government argues the copy of an

electronic payment request plaintiff "references only serves as evidence of the lack of any contract between the FBI and Mr. Yifrach." Def.'s Reply at 16. The government continues:

> First, the payment request that Mr. Yifrach references provides that, in late June 2012, a "services agreement is in process that will provide enough payment for CHS to stop reimbursement of residential rent and utilities." Def. Supp. Appx. 2 (emphasis added). The plain text of the payment request provides that the FBI was contemplating (in June 2012) a possible future agreement (not providing for payment from a preexisting contract) with a significantly more limited scope (residential rent and utilities) than alleged in the complaint. *Id.* Further, no such services agreement was ever approved and there is no services agreement in the FBI's files. Def. App. 108, Def. Supp. Appx. 6–12. Further to the point, the "Payment Receipt" demonstrates that any payments by an FBI agent to Mr. Yifrach were individually approved within an FBI agent's supervisory chain of command. Def. Supp. App. 4. There was a process for the authorization of payments, and a process for the authorization of services agreements. Mr. Yifrach fails to demonstrate that any of the named individuals at the purported March meeting possessed the authority to do either.

Def.'s Reply at 16 (emphasis omitted) (footnote omitted).

Plaintiff claims to have received more money than was documented in the "Payment Receipt," specifically a standard biweekly salary of $7,500. Tr. at 72:7–20 (citing Pl.'s Ex. G ("22 June 2012 FBI Payment Request")). The government argues plaintiff has no basis for the allegation he received payments other than those documented in the "Payment Receipt." Tr. at 72:15–20 ("THE COURT: . . . [I]s that possible in the government's perspective? [THE GOVERNMENT]: No, Your Honor. The FBI documents all of its payments. It has a full accounting of what it paid Mr. Yifrach. It never paid him $7,500 every two weeks. There is no evidence that it did."); Tr. at 80:17–24 ("[THE GOVERNMENT]: . . . [W]e have provided documentation of all the payments we have made. Counsel for the Plaintiff has the individual receipts that are much like the one that we provided in the Supplemental Appendix. There are documents for every one of those, and those are all of the payments made. There are no extra-record payments that are not contained in the file."); *see* Def.'s App. at 116 (FBI Quarterly Supervisory Source Report); App. to Def.'s Reply at 1–5 (FBI Payment Request). The lack of consistency in payment amounts and frequency (for example, a $40.40 payment on 2 August 2012 and a $58.00 payment on 20 August 2012) supports the government's characterization of the payments as expenses as opposed to salary. *See* Def.'s App. at 116–24 (FBI Quarterly Supervisory Source Reports) (showing no payment amounts were the same in a period of over one month); App. to Def.'s Reply at 1–5 (FBI Payment Request). If these payments resembled a routine salary, the routine payments may imply the existence of a contract—here, however, the erratic payments support the government's position that the payments were made to cover expenses or as part of a contingent, "pay to play" reward system based on the supply of individual pieces information. The payments ceased at the end of August 2012. Tr. at 81:20–82:4; *see* Pl.'s Resp. at 3.

In sum, plaintiff's compensation from the government cannot support an inference a contract existed.  As the government indicated at oral argument, "[u]pon receiving . . . information, the FBI will determine the value of that information."  Tr. at 46:14–17.  The nonroutine payments cannot support an inference of contractual payment as alleged by plaintiff, but instead indicate they are payments based on the "the value of [the] information" provided by plaintiff.  *Id.*  Plaintiff has not pointed to any facts in the record showing how these non-uniform previous payments create a material dispute of fact over the existence of a contract.  *See Ransom*, 900 F.2d at 244 ("To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government and entitle the plaintiff to money damages in the event of the government's breach of that contract.").

<strong>v.     Closing</strong>

Plaintiff claims he was not properly closed as a CHS, meaning his contract was never officially terminated.  Pl.'s Resp. at 5.  Specifically, plaintiff argues he never received formal notice of his closure as a CHS, giving him "every plausible and reasonable belief that he was still working as a CHS for the defendant and that his file was open and active."  *Id.*  The government contends plaintiff was notified of his closure as a CHS on 6 September 2012.  Tr. at 95:16–20; Tr. at 90:24–91:5 (citing Def.'s App. at 52 (17 Sept. 2012 FBI Agent Report)) ("[THE GOVERNMENT]:  Well, [the *Guidelines*] say[] if the confidential source can be notified, note that he has been closed.   They notified him that they were closing him, that is correct . . . .").  The government, however, acknowledges standard closing procedures were not followed because plaintiff's situation fell within an exception as laid out in the *Guidelines*.  Tr. at 97:15–24 ("THE COURT:  . . . [D]o you agree that those guidelines were not followed for closing?  [THE GOVERNMENT]:  Yes, . . . but I think the guidelines weren't followed because it falls within the exception in paragraph 3 . . ."); *see also Guidelines* § VII.A.3, Def.'s App. at 180 (". . . *if* the Confidential Human Source can be located, notify the Confidential Human Source.") (emphasis added).  As discussed in Section VII.D, *supra*, there is a reasonable inference plaintiff was not alerted to his closure, which may suspend his claim if a contract existed.  Following limited discovery, however, no additional facts related to plaintiff's closure point to a material dispute regarding the existence of a contract.

The limited discovery included FBI documentation noting plaintiff's closure for cause in October 2012, as well as documentation plaintiff was informed he was being closed as a CHS.  Def.'s App. at 47–48 (FBI Source Closing Communication); *id.* at 52 (17 Sept. 2012 FBI Agent Report) ("CHS refused to be truthful, consequently was told the case would be shut down by the FBI and he would be close[d] as a CHS.").  The government argues plaintiff received compensation as a confidential informant but "at the end of the day . . . [the FBI] determined that they could not trust Mr. Yifrach, and that is one of the reasons why we don't enter into contracts with informants . . . ."  Tr. at 157:12–15.  The only documentation in the record related to plaintiff's closure indicates he was closed by the FBI without any existing contract.  *See, e.g.*, Def.'s App. at 47–48 (FBI Source Closing Communication) ("Was the source closed for cause?  Yes. . . .   The CHS acknowledged."); *id.* at 127 ("On September 04, 2012 . . . CHS was adviced of closing . . . .").  The *Guidelines* require notification to an informant only "if the Confidential Human Source can be located."  *Guidelines* § VII.A.3, Def.'s App. at 180.  The record does not provide insight on plaintiff's knowledge of his closure, but it is not required for plaintiff to have

35

been aware of his closure.  Plaintiff has therefore not established facts in the record surrounding his closure supporting an inference a material issue of fact exists regarding the existence of an ongoing contract.[6]  *See Ransom*, 900 F.2d at 244 ("To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government and entitle the plaintiff to money damages in the event of the government's breach of that contract.").

### vi.   Whether plaintiff has identified evidence of a contract

Plaintiff notes he is unable to show any documentation indicating violation of the *Guidelines*.  Tr. at 82:17–83:3 ("[PLAINTIFF]:  Are you asking me if there's anything in the produced documents that violates the [*Guidelines*]?  THE COURT:  Yeah.  [PLAINTIFF]:  I never thought of that question.  It's an excellent question. . . . I don't think I could point to a document that they produced that shows that they didn't follow their own procedure.").  Plaintiff's admissions therefore also fail to support the existence of a contract when he was allegedly "reopened when he was contacted again [by a federal employee who received plaintiff's name from the FBI]."  Tr. at 103:24–104:3; Tr. at 127:1–7; Am. Compl. ¶ 81.  The record does not indicate he was reopened based on FBI protocols, and plaintiff has not pointed to anything in the record showing his contact with agents following his closure resulted in a contract.  Plaintiff further acknowledges all allegations of violations of the *Guidelines* are allegations of oral promises or unproduced written documents.  Tr. at 84:5–8 ("THE COURT:  . . . But you agree, though, that all of those things are allegations of oral promises or written documents that we don't have copies of.  [PLAINTIFF]:  100 percent . . . .").  In sum, plaintiff failed to produce any evidence demonstrating the existence of a contract.  *See Ransom*, 900 F.2d at 244 ("To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government and entitle the plaintiff to money damages in the event of the government's breach of that contract.").

Regarding plaintiff's allegations of oral promises in connection with cash payments, the Court previously echoed concerns with the current jurisprudence surrounding confidential informant cases:

> [C]onsidering the FBI procedure for contracting with confidential informants, the Court notes potential for concern due to the recurring trend in a growing line of confidential informant breach of contract cases.  That is, FBI special agents allegedly promise compensation to informants, but when informants sue the government for breach of these alleged promises, these cases are often dismissed pursuant to RCFC 12 or decided in favor of the government on summary judgment due to the agents' lack of contracting authority, which the Federal Circuit regularly affirms.

---

[6] Plaintiff's counsel suggested at oral argument plaintiff's lack of knowledge of his closure may have extended until plaintiff filed his Complaint.  *See* 14 Dec. 2021 Oral Arg. Tr. at 115:14–16 ("[PLAINTIFF]:  . . . [Plaintiff] assumes now [he was closed] because I told him he's fired, but no one ever gave him formal notice."); Tr. at 21:16–19 ("[PLAINTIFF]:  . . . I think I even half jokingly said, 'By the way, until today, he still thinks he's a CHS,' because no one from the FBI formally sent him a letter asking him to sign any closing documents.").

*Yifrach I*, 145 Fed. Cl. 691, 705 (2019), *aff'd*, 825 F. App'x 899 (Fed. Cir. 2020) (mem.).[7]  The Court reemphasizes those concerns here.  Additional facts in this case give the Court additional pause.  For example, the government acknowledges the *Guidelines* do not require a translator when addressing "admonishments" with an informant, and none seems to have been present in this case.  *See* Tr. at 55:2–11.  Likewise, plaintiff alleges his lawyer was "held at the airport for questioning . . . , was denied entry into the U.S.[,] and had to fly back to Israel."  Am. Compl. ¶ 34.  These facts, though not sufficient to indicate a contract actually existed, do not instill confidence the FBI compensation contracting process is as transparent to potential informants as it should be.  Nevertheless, for the reasons *supra*, the Court grants the government's motion for summary judgment.

## IX.    Whether Plaintiff's Request for Additional Discovery Is Warranted

### A.    The Parties' Arguments

Plaintiff contends "[a] genuine issue of material fact . . . exists concerning the contract claim."  Pl.'s Resp. at 15 (citing *Janowsky v. United States*, 133 F.3rd 888, 892 (Fed. Cir. 1998)).  Plaintiff states considering the "many material facts regarding whether the government may have

---

[7] In *Yifrach I*, the Court noted concern with the growing line of cases where FBI agents allegedly promise compensation to informants, but the FBI agents' lack of contracting authority leads to dismissal.  The Court noted: "The following is a non-exhaustive list of other similarly-decided confidential informant breach of contract cases from this Court resolved in favor of the government.  *See, e.g.*, *Cornejo-Ortega v. United States*, 61 Fed. Cl. 371, 374–76 (2004) (granting the government's converted summary judgment motion despite allegations government agents promised plaintiff $2.2 million in exchange for information leading to the arrest of a top fugitive because plaintiff did not submit evidence showing the agents had actual authority to contract); *Tracy v. United States*, 55 Fed. Cl. 679, 682–84 (2003) (granting the government's summary judgment motion because, despite alleging DEA agents orally promised plaintiff compensation in exchange for information, plaintiff did not submit evidence showing any of the DEA agents had actual authority to contract); *Humlen v. United States*, 49 Fed. Cl. 497, 504 (2001) (granting the government's summary judgment motion, despite the existence of a duly-authorized written contract with the FBI, because plaintiff claimed breach of oral agreement, but plaintiff did not produce evidence showing the FBI agents who made oral compensation promises had actual authority to contract); *Toranzo-Claure v. United States*, 48 Fed. Cl. 581, 583–84 (2001) (granting the government's summary judgment motion because, despite proving $69,640 of total payments for informant services, plaintiff did not prove the DEA agents he worked with had actual authority to contract); *Doe v. United States*, 48 Fed. Cl. 495, 501–03 (2000) (granting the government's summary judgment motion because, despite the existence of a DEA Cooperation Agreement, plaintiff did not submit evidence showing the DEA agents whom plaintiff worked with had actual authority to contract, nor did a contracting officer ratify the agreement); *Khairallah v. United States*, 43 Fed. Cl. 57, 61–64 (1999) (granting the government's summary judgment motion because plaintiff did not produce evidence to show the DEA agents he worked with had actual authority to contract, nor that anyone with actual authority ratified the alleged agreement to pay plaintiff 25% of assets forfeited due to his informant work); *Roy*, 38 Fed. Cl. at 191–92 (granting the government's summary judgment motion because although the FBI paid plaintiff $100,000 according to the alleged contract, plaintiff did not produce evidence showing any of the FBI agents he worked with had actual authority to contract); *Cruz-Pagan v. United States*, 35 Fed. Cl. 59, 63 (1996) (granting the government's summary judgment motion because DEA regulations precluded field agents from having actual authority to contract, so the DEA agents plaintiff worked with could not have had implied contracting authority); *see also SGS-92-X003 v. United States*, 85 Fed. Cl. 678, 702–06 (2009) (finding after trial that the DEA Assistant Special Agent in Charge did not have authority to promise in advance specified percentages of forfeiture awards to confidential informant).  *But see Brunner v. United States*, 70 Fed. Cl. 623, 643, 647–48 (2006) ( . . . finding an enforceable contract existed between plaintiff and the government where DEA Resident-Agent-in-Charge had implied authority to contract and authorized salary payments to plaintiff because the authority to approve payments to informants implicitly included the authority to contract for such payments)."  *Yifrach I*, 145 Fed. Cl. at 706 n.8.

ratified an unauthorized contract with plaintiff[,] . . . plaintiff should be afforded an opportunity to conduct discovery on . . . all issues contested by defendants." *Id.* at 16. At oral argument, however, plaintiff narrowed the request to depositions. Tr. at 142:16–22 ("THE COURT: . . . You have [all] documents that could possibly exist. [PLAINTIFF]: According to the government . . . and I don't have any reason . . . to disbelieve [the government.] [B]ut I think that if we took more depositions, we would find out that there are more documents."). The government counters plaintiff "does [not] meet the basic requirements for the grant [of] such a request" for additional discovery. Def.'s MTD/MSJ at 18–19. The government alleges plaintiff "must provide . . . '[explicit] reasons why discovery is required in opposition to the motion for summary judgment.'" *Id.* at 19 (quoting *Opryland USA, Inc. v. Great Am. Music Show, Inc.*, 970 F.2d 847, 852 (Fed. Cir. 1992)). According to the government, plaintiff has not "articulate[d] what . . . information he would expect to obtain from such discovery." *Id.*

### B.     Applicable Law

While this Court may, in certain instances, require discovery to facilitate a response to a motion for summary judgment, a plaintiff must meet certain standards to allow for such a request to be granted, *see* RCFC 56(d), and "[s]ummary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 627 (Fed. Cir. 1984). RCFC 56(d) states:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>     (1) defer considering the motion or deny it;
>     (2) allow time to obtain affidavits or declarations or to take discovery; or
>     (3) issue any other appropriate order.

A party opposing summary judgment must provide the Court with an affidavit containing explicit "reasons why discovery is required in opposition to the motion for summary judgment." *Opryland USA, Inc.*, 970 F.2d at 852. The party is "required to state with some precision the materials he hope[s] to obtain with further discovery, and exactly how he expect[s] those materials would help him in opposing summary judgment." *Simmons Oil Corp. v. Tesoro Petroleum Corp.*, 86 F.3d 1138, 1144 (Fed. Cir. 1996) (quoting *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435 (5th Cir. 1993)). A party must demonstrate "'how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'" *Id.* (quoting *Willmar Poultry Co. v. Morton-Norwich Prods., Inc.*, 520 F.2d 289, 297 (8th Cir. 1975), *cert. denied*, 424 U.S. 915 (1976)).

### C.     Whether Plaintiff Articulates Why Discovery Is Required in Opposition to the Government's Motion for Summary Judgment Pursuant to RCFC 56

Plaintiff states he "should be permitted to conduct additional discovery on all issues contested by defendants." Pl.'s Resp. at 16. At oral argument, plaintiff clarified his only request for additional discovery relates to depositions, not documents, because both parties confirmed all

relevant documents (with or without redactions)[8] have been produced.  *See* Tr. at 21:11–17; Tr. at 24:23–25:7; Tr. at 20:20–21:5 ("THE COURT:  . . . [F]rom the government's perspective, all relevant documents, either in FBI files or AUSA files, have been produced?  [THE GOVERNMENT]:  That is correct, Your Honor.  THE COURT:  . . . [F]rom plaintiff's perspective, other than the suspicion that there might have been a document destroyed, you have no reason to assume that there were any files that . . . have not been searched for and found?  [PLAINITFF]:  Correct.").  Plaintiff only requests depositions with hopes of shaking free some as-yet-unknown supporting document.  *See* Tr. at 142:16–22.  Given plaintiff has not pointed to anything in the record supporting an issue of material fact as to his allegations, and considering plaintiff has not submitted an affidavit describing the need for discovery pursuant to RCFC 54(d), the Court accordingly denies plaintiff's request for additional discovery.  *See Keebler Co. v. Murray Bakery Products*, 866 F.2d 1386, 1389 (Fed. Cir. 1989) (citations omitted) ("A party may not simply assert that discovery is necessary and thereby overturn summary judgment when it failed to comply with the requirement . . . to set out reasons for the need for discovery in an affidavit.").

## X.    Conclusion

The Court has considered all allegations in plaintiff's Amended Complaint and related motions.  For the foregoing reasons, the government's Motion to Dismiss, ECF No. 71, is **DENIED**, and the government's Motion for Summary Judgment, ECF No. 71, is **GRANTED**.  The Court accordingly **FINDS as MOOT** the government's Motion to Dismiss, ECF No. 45, filed on 5 April 2021.  The Clerk is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge

---

[8] The Court conducted an *in camera* review of pages 556–65 of the FBI's file, which were "withheld from production because the information contained there is associated with [the Department of] Homeland Security and Border Protection."  Tr. at 13:1–4; Tr. at 17:12–13 ("[PLAINTIFF]:  I do have [page] 555 unredacted.").  Upon confirmation from the government pages "556 to 562 are printed travel reservation passenger name record documents [of] individuals . . . relat[ed] to Mr. Yifrach," Tr. at 15:13–15, and pages "563 to 565 [are] automated passenger information system profiles of [Mr.] Yifrach['s] family members," Tr. at 15:17–19, plaintiff confirmed he has no further requests regarding document production and accepts there is no dispute regarding the *in camera* documents.  Tr. at 17:23–18:5 ("THE COURT:  . . . So, [plaintiff], does that satisfy plaintiff's concerns regarding the redaction of these documents?  [PLAINTIFF] Yes.  THE COURT:  So, to confirm, then, plaintiff has no further requests and agrees that if the documents are as described, then there's no dispute?  [PLAINTIFF]:  Correct.").